Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
406-721-1435
tim@bechtoldlaw.net

Rebecca K. Smith
Public Interest Defense Center, P.C.
PO Box 7584
Missoula, MT 59807
406.531.8133
publicdefense@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

ALLIANCE FOR THE WILD
ROCKIES

       Plaintiff,              CV-

vs.

CHRIS SAVAGE, Kootenai National
Forest Supervisor; LEANNE
MARTEN, Regional Forester of Region
One of the U.S. Forest Service;
UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of
Agriculture; and U.S. FISH AND
WILDLIFE SERVICE, an agency of the
U.S. Department of Interior,

       Defendants**.**

**COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF**

**Complaint**                   **Page 1**

# I. INTRODUCTION

1. On May 7, 2013, the Kootenai National Forest Supervisor signed a Record of Decision (ROD) authorizing Alternative 3 of the Pilgrim Creek Timber Sale project. Plaintiff Alliance for the Wild Rockies (Alliance) filed suit over the Pilgrim Project alleging that the Pilgrim Project violated the Kootenai National Forest Plan Access Amendments Standard II(B), including specifically that the miles of roads behind earthen berms should be included in the calculation of linear miles of total roads in Bears Outside the Recovery Zone (BORZ) polygons on the forest.

2. On May 17, 2017, the Ninth Circuit Court of Appeals held that the miles of road behind earthen berms did not count in the linear miles of total roads in BORZ areas. *See Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238 (9th Cir. 2017).

3. The Ninth Circuit further held that "any closure that fails to effectively prevent motorized access also fails to comply with Standard II(B) of the Access Amendments." *Id.* at 1243.

4. Thereafter, investigators conducted a survey of berm-closure effectiveness in the Clark Fork and Tobacco BORZ in the Kootenai National Forest in October of 2017, and discovered numerous berms that "fail to effectively prevent motorized access," and thus fail to comply with Standard II(B) of

the Access Amendments under the Ninth Circuit's opinion in *Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238 (9th Cir. 2017).

5.   On December 21, 2017 Plaintiff Alliance for the Wild Rockies (Alliance) sent Defendants U.S. Forest Service and U.S. Fish & Wildlife Service a 60-Day Notice of Intent to Sue for violations of the Endangered Species Act, and included photographs of numerous berms in the Kootenai National Forest that fail to effectively prevent motorized access.

6.   More than 60 days have passed since Defendants U.S. Forest Service and U.S. Fish & Wildlife Service received the 60-Day Notice. Alliance has not received any response to the 60-Day Notice.

7.   Because the berms are ineffective at preventing motorized access, the Kootenai National Forest is not in compliance with the current Biological Opinion and Incidental Take Statement for the Access Amendments and Pilgrim project.

8.   The agencies must reinitiate ESA consultation on the Access Amendments and Pilgrim Project because the original analyses presumed no motorized access would occur behind berms and that assumption has proven false.

9.   Moreover, the investigators discovered numerous roads, including roads with no berm whatsoever, that were unaccounted for in the Forest Service Road databases of linear miles of total roads in the BORZ polygons.

Because these roads exist on the BORZ landscape with no berm that effectively prohibits motorized access, and because these roads are not included in the Forest Service's database, the linear miles of total roads in the BORZ has increased over the baseline that is set forth in the Access Amendment. This is a violation of the Access Amendment, which prohibits any net increase in linear roads above the baseline set forth in the Access Amendment.

10.    The ineffective berms and additional roads require a new Incidental Take Statement under Section 9 and reinitiation of consultation under Section 7 for both the Access Amendment and the Pilgrim Project.  The addition of new roads to the baseline violates the Access Amendment and thus violates NFMA.

## II.  JURISDICTION

11.    This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

12.    An actual controversy exists between Plaintiff and Defendants.  Plaintiff's members use and enjoy the Kootenai National Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in

other vocational, scientific, spiritual, and recreational activities. Plaintiff's members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

13.   The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiff's members have been and will be adversely affected and irreparably injured by Defendants' failures to comply with law. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, ESA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

14.   Plaintiff submitted timely written comments concerning the Access Amendments and the Pilgrim Project and fully participated in the available administrative review and appeal processes, thus it has exhausted administrative remedies.  Defendants' denial of Plaintiff's administrative appeal was the final administrative action of the U.S. Department of Agriculture Forest Service.  Thus, the Court has jurisdiction to review Plaintiffs' APA claims.

### III. VENUE

15.   Venue in this case is proper under 28 U.S.C. §1391(e) and LR 3.3(a)(1).

Defendants Savage and Marten reside within the Missoula Division of the

United States District Court for the District of Montana.

## IV. PARTIES

16.   Plaintiff ALLIANCE FOR THE WILD ROCKIES (Alliance) is a tax-exempt,

non-profit public interest organization dedicated to the protection and

preservation of the native biodiversity of the Northern Rockies Bioregion,

its native plant, fish, and animal life, and its naturally functioning

ecosystems.  Its registered office is located in Missoula, Montana. The

Alliance has over 2,000 individual members, many of whom are located in

Montana.  Members of the Alliance work as fishing guides, outfitters, and

researchers, who observe, enjoy, and appreciate Montana's native wildlife,

water quality, and terrestrial habitat quality, and expect to continue to do so

in the future, including in the Kootenai National Forest.  Alliance's

members' professional and recreational activities are directly affected by

Defendants' failure to perform their lawful duty to protect and conserve

these ecosystems by approving the challenged Project.  Alliance for the

Wild Rockies brings this action on its own behalf and on behalf of its

adversely affected members.

17.   Defendant CHRIS SAVAGE is the Supervisor for the Kootenai National

Forest, and in that capacity is charged with responsibility for ensuring that decisions made at the District and Forest level in the Kootenai National Forest are consistent with applicable laws, regulations, and official policies and procedures.

18.   Defendant LEANNE MARTEN is the Regional Forester for the Northern Region/Region One of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Kootenai National Forest, are consistent with applicable laws, regulations, and official policies and procedures.

19.   Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Kootenai National Forest.

20.   Defendant UNITED STATES FISH AND WILDLIFE SERVICE (Wildlife Service or FWS) is an administrative agency within the U.S. Department of Interior and is responsible for lawful management of species listed under the Endangered Species Act, including the ESA-listed Cabinet-Yaak grizzly bear.

## V. FACTUAL BACKGROUND

### A. Habitat and Status of the Cabinet-Yaak Grizzly Bear

21.     Before European settlement of the American West, grizzly bears (*Ursus arctos horribilis*) roamed west from the Great Plains to the California coast, and south to Texas and Mexico, inhabiting almost every conceivable habitat. With westward expansion, grizzlies were "shot, poisoned, and trapped wherever they were found." 72 Fed. Reg. 14,866, 14,868 (Mar. 29, 2007).

22.     Human settlers eliminated these bears from almost everywhere in the coterminous United States, with the exception of five areas in mountainous regions, national parks, and wilderness areas of Washington, Idaho, Montana, and Wyoming. 1993 Grizzly Bear Recovery Plan.

23.     Once over 50,000 strong in the lower 48 states, grizzlies were reduced to less than 1,000 bears. Grizzly bears were eliminated from Texas by 1890, from California by 1922, from Utah by 1923, from Oregon by 1931, from New Mexico by 1933, and from Arizona by 1935. 1993 Grizzly Bear Recovery Plan.

24.     Thus, in a historical blink of an eye, from the 1800s to the early 1900s, humans reduced the range of the grizzly bear to less than 2% of its former range south of Canada, limiting the bear to a few isolated populations in

remnant wildlands. 72 Fed. Reg. 14,868 (Mar. 29, 2007); Biological
Assessment at 8.

25.    One of these remnant and isolated grizzly bear populations is found in the
Cabinet-Yaak Ecosystem of northwestern Montana and northern Idaho.
October 18, 2011.  Access Amendment Biological Opinion A-6

26.    The Cabinet-Yaak Ecosystem is composed of two distinct geographic areas
bisected by the Kootenai River: the Cabinet Mountains lie to the south of
the Kootenai River, and the Yaak River drainage lies to the north. Cabinet-
Yaak Grizzly Bear Recovery Area 2011 Research and Monitoring Progress
Report at 4.

27.    The region experiences a unique Pacific maritime climate, despite its
mountainous, inland location: there are warm summers, as well as wet
winters with heavy snowfall. The landscape alternates from rugged, alpine
glaciated peaks, to dense coniferous forests, to lush meadows and riparian
areas along the meandering Yaak River. Cabinet-Yaak Grizzly Bear
Recovery Area 2011 Research and Monitoring Progress Report at 7.

28.    Stand-replacing wildfires are a natural occurrence in the Cabinet-Yaak
Ecosystem, and they have created a mosaic of dense forest interspersed
with openings of huckleberry shrubfields. Cabinet-Yaak Grizzly Bear
Recovery Area 2011 Research and Monitoring Progress Report at 7.

29.     The majority of the Cabinet-Yaak Ecosystem – 90% – is National Forest land, managed by the Forest Service. 2011 annual monitoring report. In particular, approximately 72% of the Cabinet-Yaak Ecosystem is managed by the Kootenai National Forest. October 2011 Access Amendment Biological Opinion at A-17.

30.     The grizzly bear's natural characteristics make it particularly vulnerable to human persecution: grizzlies are hard to grow, but easy to kill. Due to their late age at first reproduction, small litter sizes, and the long interval between litters, grizzlies have one of the slowest reproductive rates of North American mammals. The Wildlife Service has stated that a female grizzly can replace herself with one breeding age female in the first decade of her life. 2011 Grizzly Bear Five-Year Review: Summary and Evaluation at 22.

31.     Grizzly bear cubs stay with their mother for two to three years, learning about finding food and survival in the wild, before they disperse to establish their own home range. Federal Register Vol. 72 No. 60 March 29, 2007 at 14867.

32.     Grizzlies have extraordinarily large home ranges of hundreds of square miles, and the bears are capable of traveling over 60 miles at a time. 1993 Grizzly Bear Recovery Plan at 21.

33.   Within these large home ranges grizzlies require "some level of safety from human depredation and competitive use of habitat that includes roading, logging, mining, human settlement, grazing, and recreation." Access Amendment Biological Opinion, October 2011 at A-54.

34.   In particular, the Wildlife Service cautions that "[r]oads probably pose the most imminent threat to grizzly habitat today." 1993 Grizzly Bear Recovery Plan.

35.   The Forest Service estimates that 69% of grizzly bear mortalities are caused by humans. Roads literally pave the way for these mortalities; they provide humans with access into grizzly bear habitat, which leads to direct mortality through illegal shootings, and to indirect mortality through habituation.

36.   In 1975, the Wildlife Service listed grizzly bears in the lower 48 states as a "threatened" species under the ESA. Access Amendment Biological Assessment, 2010. The Wildlife Service found that the grizzly bear needed to be listed under the ESA for essentially three substantive reasons. The first reason was that land development had reduced the bear's range to isolated populations. The second reason was that bears were subject to mortality from humans due to the increased number of logging access roads, as well as trail construction, that put humans in formerly

inaccessible areas of the bear's habitat. The third reason for listing was that bears were subject to mortality due to the tendency of ranchers to shoot bears to protect livestock grazing on National Forests.

37. The Wildlife Service approved a Grizzly Bear Recovery Plan in 1982 and revised the Plan in 1993.

38. The 1993 Recovery Plan established four recovery zones, including the Cabinet- Yaak Ecosystem.

39. In 1993, and again in 1998 and 1999, the Wildlife Service re-visited its decision to list all of the lower 48 grizzly bear populations as "threatened." It concluded every time that the Cabinet-Yaak grizzly population had deteriorated to the point of warranting an "endangered" classification because "protective measures have not achieved desired goals for habitat protection . . . ."

40. In response to litigation that requested FWS uplist the population to endangered, on December 5, 2014, FWS issued a decision that the population was no longer warranted for the endangered classification. However, this Court set aside that determination as arbitrary and capricious on August 22, 2017.   Thus, the population is still warranted for listing as endangered.

41. The Wildlife Service finds that the Cabinet-Yaak population is "in danger

of extinction" due in part to the cumulative impacts of timber harvest and its associated road construction.

42.   The population currently fails to meet the minimum viable population estimate of 100 bears.

43.   FWS's most recent monitoring report (for the monitoring year 2016) indicates that 2007-2016 has been a period of increasing mortality rates.

44.   Not only is the Cabinet-Yaak population estimate below viable and the mortality rates increasing, but these bears are also failing to meet all recovery targets: in the most recent monitoring period (2011-2016), the bears are failing the targets for females with cubs, the human-caused mortality limit, the female human-caused mortality limit, and the target for distribution of females with young. The 1993 Recovery Plan is clear that "the mortality goal for this ecosystem *is zero* until the three key parameters monitored indicate a population of approximately 100 bears." (emphasis added). Thus, the recovery target at this time is 0.0 for human-caused mortality and 0.0 for female human-caused mortality, which were both exceeded in the 2011-2016 period because there were 10 known or reported mortalities, including one female bear.

45.   Over the past two decades, dozens of grizzly bears have been killed by humans. The Wildlife Service assumes that these recorded deaths paint

only a partial picture: "[u]nknown, unreported, human-caused mortality occurs each year at some level." Indeed, the agency's best estimate is that "known human caused mortality may represent only 50 percent of total human caused mortality in the northern grizzly bear recovery zones."

## B. Management History of the Cabinet-Yaak Grizzly Bear

46.     As noted above, the Kootenai National Forest manages 70% of the Cabinet- Yaak Ecosystem.

47.     The designated "Recovery Zone" for the grizzly bear in the Cabinet-Yaak Ecosystem is divided into bear management units ("BMUs").  Fifteen of the 22 BMUs in the Cabinet-Yaak Ecosystem are managed by the Kootenai National Forest, and two BMUs are managed by both the Kootenai National Forest and Idaho Panhandle National Forest (IPNF). Access Amendment Draft Supplemental EIS at 47.

48.     During preparation of the 1987 Kootenai National Forest Land and Resource Management Plan ("Forest Plan"), the Forest Service acknowledged that timber harvest and associated activities could have a negative cumulative impact on grizzly bears: "[a]lthough individual uses may be well planned and not affect the grizzly bear or its habitat, the combined effect of several activities (over time and space) may be negative."

49.    Indeed, the Wildlife Service found that the original Forest Plan proposal would jeopardize the survival of the Cabinet-Yaak grizzly bear, thus the final Forest Plan included standards from the Interagency Grizzly Bear Committee ("IGBC") to avoid causing jeopardy to the bears.

50.    The final version of the 1987 Forest Plan set forth a Forest-wide standard to apply the "Kootenai Grizzly Management Situation Guidelines" to all projects impacting grizzly bear habitat. The Forest Plan prohibited open road density ("ORD") above 0.75 miles of road per square mile of Forest in each Bear Analysis Area ("BAA"), which are sub-units of BMUs.

51.    In 1995, the Wildlife Service published a Biological Opinion and Incidental Take Statement (1995 ITS) for the 1987 Kootenai Forest Plan. The 1995 ITS stated that "the [Wildlife] Service believes incidental take has and will occur from [] the effects of implementing the Forest Plan in its original form . . . ." This opinion was based in part on recent guidance from the IGBC. The 1995 ITS then stated that although there was a "take" of the grizzly bear there would be no "jeopardy" to the bear's survival if the Forest Service followed the new terms of incidental take statement.

52.    The terms of the incidental take statement were that the Forest Service would eventually implement Forest-wide standards adopting IGBC recommendations on limits on the percentage of open motorized route

density over one mile of road per square mile of Forest ("OMRD"), total motorized route density over two miles of road per square mile of Forest ("TMRD"), and core habitat. In the interim period, the Forest Service would adhere to the following terms: (1) no increase in ORD above the Forest Plan standard of 0.75; (2) no increase in open motorized trail density; (3) no increase in net TMRD; and (4) no decrease in existing amount of core area.

53.     The conclusion that adherence to these terms would avoid jeopardy to the survival of the grizzly bear was in part based upon available evidence that the Cabinet-Yaak population was increasing, bears were reproducing, and the mortality rate was decreasing.

54.     Three years later, the Selkirk/Cabinet-Yaak Grizzly Bear Subcommittee of the IGBC adopted what it called the "Interim Access Management Rule Set" (1998 Rule Set). The 1998 Rule Set required the following: (1) strive to provide a minimum of 70 percent habitat effectiveness (security) in each Bear Management Unit (BMU); (2) no net loss of existing core habitat in Priority 1, 2, and 3 BMUs; (3) work to achieve 55% core habitat; (4) no net increase in OMRD; and (5) no net increase in TMRD.

55.   The 1998 Rule Set did not adopt numeric thresholds for OMRD or TMRD, minimum sizes for core habitat blocks, or minimum durations for the protection of core habitat blocks.

56.   The Forest Service adopted the 1998 Rule Set without initiating ESA §7 consultation with the Wildlife Service.

57.   On January 24, 2000, Plaintiff filed a complaint in the U.S. District Court for the District of Montana, in part to challenge the fact that the 1998 Rule Set did not undergo ESA §7 consultation, and to force the Forest Service to adopt Forest-wide standards for road density on the Kootenai National Forest, as envisioned and ordered by the 1995 ITS.

58.   In a settlement agreement approved by the district court on March 25, 2001, the Forest Service agreed, among other things, to address Forest-wide grizzly bear access management by completing "Access Management Amendments" for the Forest Plan, and to consult with the Wildlife Service on those Access Management Amendments pursuant to §7 of the ESA.

59.   In March 2002, the Forest Service completed the Final EIS for the Access Management Amendments. On February 9, 2004, the Wildlife Service issued a Biological Opinion and Incidental Take Statement for the Access Management Amendments. In March 2004, the Forest Service published a Record of Decision approving the Access Management Amendments.

60.     The Access Management Amendments set standards loosely derived from a research report produced in 1997 by Idaho Fish & Game Department Biologist Wayne Wakkinen and Wildlife Service biologist Wayne Kasworm (1997 Wakkinen Study). Wakkinen and Kasworm collected research data from six radio-collared grizzly bears in the Selkirk and Cabinet- Yaak Ecosystems to determine the maximum levels of open and total route density, and minimum level of core habitat, that grizzly bears could tolerate.

61.     The study found that the common denominators that all six bears tolerated were 72% core habitat, 17% OMRD, and 14% TMRD. The authors noted that a minimum core size was probably between two square miles and eight square miles.

62.     After the study was completed, two of the six bears (one-third of the study population) were killed.

63.     The average of the densities tolerated by the bears were 55% core habitat, 33 % OMRD, and 26% TMRD. These are the numbers the agencies chose to use as the basic Forest-wide habitat standards for the Cabinet-Yaak grizzly bear in the Access Management Amendments.

64.     Conservation groups disagreed that standards derived from the averages in the 1997 Wakkinen Study were sufficient to conserve and recover the

Cabinet-Yaak grizzly bear, and they filed suit to challenge the adoption of the standards. *Cabinet Resource Group v. U.S. Fish and Wildlife Service*, 465 F.Supp.2d 1067 (D. Mont. 2006). The groups argued that the habitat parameters measured in the Wakkinen study merely reflect the bears' selection of the best habitat available on an already degraded landscape where the bear population is already heading toward extinction, thus the averages of those parameters are not adequate to recover the bear population. Moreover, in light of the fact that the habitat conditions proved lethal to one-third of the study population and that one bear reached full adulthood during the study, reliance on those averages was further misplaced.

65.   Some Wildlife Service biologists also expressed reservations about the Wakkinen's study's findings as a result of these shortcomings. Two biologists who commented on a draft of the Wakkinen study in 1996 stated:

> We remain concerned that we are studying bears and drawing conclusions from their use in an already degraded environment. Are we developing habitat-use conclusions from grizzly bears that are just barely getting by? Or are the grizzly bears thriving and successfully reproducing in the study areas? You state in the discussion that survival and reproduction success must be considered when selecting animals to use as the basis for standards-we support this and recommend including additional information on this topic. If the grizzly bears are not thriving in the existing environmental baseline, we may need to develop open road densities, total road densities, and

core standards that are more conservative than would be indicated by this study.

66.     Again in 1998, when Wakkinen's 33% OMRD, 26% TMRD, and 55% core habitat standards were before the IGBC's Cabinet-Yaak/Selkirk Subcommittee as proposed standards for access management, a biologist in the Fish & Wildlife Service's Spokane office questioned the adequacy of the Wakkinen parameters:

> This office has never concurred with the minimum 55% core suggested by the SE/CYE Access Task Group. The best available and most defensible scientific information available on the core security needs of female grizzly bear comes from the combined data sets: SE-CYE, 55% core (n=6) and the NCDE 68% core (n=8), arithmetic mean of 61.5% core (n=14). Accordingly, we propose a long-term strategy based on 61.5% core with concomitant reductions in open road density and total road density.

67.     A Telephone Conversation Record of a conference call among Fish & Wildlife Service biologists on March 22, 2001 suggested that the authors of the 2004 Biological Opinion initially disregarded the Wakkinen study in favor of a more protective standard that they deemed more accurate, but that they were overruled by superiors within the agency. The Telephone Conversation Record stated:

> I also reminded Carole that when we first started writing this BO [biological opinion], we suggested managing for criteria that is greater than the "Waynes" numbers because of our concern with data size, better applicable data sets on female home ranges from the [Northern Continental Divide Ecosystem], etc. However, we were told by Helena that any BO requiring standards in excess of the "Waynes" numbers

would not be supported, and Chris Servheen in fact, stated that he would go directly to our Regional Director and recommend that she not support such a BO.

68.     Although the district court eventually concluded that the standards satisfied

the ESA, the court set aside adoption of the Access Management

Amendments as a violation of the National Environmental Policy Act

("NEPA") for failing to address the flaws in the Wakkinen Study. More

specifically, the agencies failed to address the significance of the fact that

the bears may have been simply choosing the best available habitat on a

degraded landscape and that hypothesis could not be tested unless the

conditions were studied in comparison to the larger landscape area. The

Court concluded:

> Given the statements of the Wakkinen authors, the misgivings of other biologists about the range of habitat choices available to the bears, and the ongoing mortality problems in these populations, there can be no ...accurate prediction of the impact of the proposed action until the Forest Service has assessed the importance of the missing information.
> ...
> The [new] analysis [upon remand] must acknowledge that the Wakkinen study's authors were unsure whether the bears they studied had chosen optimal habitat or whether they simply chose the best habitat available from a degraded landscape. The analysis must assess the relevance and importance of this flaw in the Wakkinen study. In so doing, the analysis must take into account the misgivings of Fish & Wildlife Service biologists over the 33/26/55 standard, the findings of other studies measuring habitat parameters in other ecosystems, and the state of grizzly bear mortality in the Cabinet-Yaak and Selkirk Recovery Zones.

69.  On May 17, 2007, the Wildlife Service withdrew the Biological Opinion it had issued for the EIS that was set aside by the district court's opinion.

70.  After the district court set aside the Access Management Amendments, the Forest Service produced an internal memorandum in 2006 that it referred to as the "interim rule set" for grizzly bear management.

71.  The Forest Service stated that the interim rule set standards were derived from the 1987 Kootenai Forest Plan, consultations since 1987, the 1995 ITS, and the 1998 Rule Set.

72.  The standards require (1) habitat effectiveness greater than or equal to 70%; (2) ORD less than or equal to 0.75 miles/square mile, which is measured by taking the average of all BAAs within a BMU; (3) no net increase in OMRD; (4) no net increase in TMRD; (5) no net decrease in core area; (6) work to achieve 55% core, and (7) no increase in existing open motorized trail density.

73.  The Forest Service did not conduct ESA § 7 consultation for the interim rule set.

74.  In November, 2011, the Forest Service completed the Final Supplemental EIS for the Access Management Amendments and published a Record of Decision approving the Access Management Amendments.  On October 18, 2011, the Wildlife Service issued a Biological Opinion and Incidental

Take Statement for that Access Management Amendments.

75.     The changes from the 2004 Access Amendments included adjustments to standards for seven BMUs, a modified timeline to achieve the standards, and a change in the "Bear Year" and corresponding administrative use.

76.     The changes from the 2004 Access Amendments also included management direction for linear miles of open and total road densities for seven areas outside of the Cabinet-Yaak grizzly bear recovery zone (KNF and IPNF) and Selkirk grizzly bear recovery zone (IPNF) that are experiencing recurring use by grizzly bears. These seven areas are referred to as "Bears Outside of Recovery Zones" or "BORZ."

77.     The November 2011 Record of Decision approving the Access Management Amendments adopted Addendum to Forest Plan Appendix 8 Motorized Access Management Direction for the Kootenai National Forest. The standards applying to the BORZ areas located outside of the Cabinet-Yaak Grizzly Bear Recovery Zone on the KNF read as follows:

> II. The following access management applies to four grizzly bear recurring use areas (i.e., BORZ areas) located outside of the Cabinet-Yaak Grizzly Bear Recovery Zone on the KNF:
>
> A. The Forest shall ensure no increases in permanent linear miles of open road[1] on National Forest System lands in any individual BORZ, above the baseline conditions identified in Table 2, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of

RS2477 thoroughfares). Potential increases in linear miles of open roads must be compensated for with in-kind reductions in linear miles of open road concurrently with, or prior to, project implementation within the same BORZ.

[1]Open roads are roads that are open for all or part of the active bear year.

Temporary increases in linear miles of open roads are acceptable under the following conditions:

1. Roads closed[2] to public motorized use or roads created or reconstructed to facilitate land management activities that are otherwise closed to public land use may be "opened" to the public immediately following completion of all mechanized harvest and post-harvest slash activities requiring use of the road, to allow motorized public use during the bear summer season prior to the fall bear hunt (i.e., June 16 -August 31) for activities such as personal firewood collection. This public access would only be provided in cases where the mechanized harvest and/or post-harvest slash activities occurred during the same active bear year.

[2]Closed with a closure order and/or some type of closure device such as a gate.

B. The Forest shall ensure no net permanent increases in linear miles of total roads[3] in any individual BORZ area above the baseline conditions identified in Table 2, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of RS2477 thoroughfares, etc.). Otherwise, potential increases in linear miles of total roads must be compensated for with in-kind reductions in linear total road miles concurrently with, or prior to, new road construction or reconstruction of currently bermed or barriered roads.

[3]Includes roads that do not have restrictions on motorized use and roads that are closed to public motorized use.

Temporary increases (not off-set) in linear miles of total roads are acceptable under the following conditions:

1. Temporary increases in linear miles of total roads are acceptable under the following conditions:

a. Newly constructed roads would be effectively gated and would be restricted with a CFR closure clarifying they are not open for public use.

b. These roads[4] shall be closed immediately upon completion of activities requiring use of the road, except as described in Part II. A.1., above. Roads must be closed with a berm, guardrail or other measure that effectively prevents motorized access, and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years.

[4]Includes temporary roads built to facilitate the completion of the project and not intended to be left on the landscape—i.e. typically for 10 years or less) as well as the re-opening of existing bermed or barriered road prisms.

c. Upon completion of a land management project, linear miles of total roads would be returned to or below the baseline levels contained in Table 2.

C. Timber harvest activities that would occur within multiple watersheds shall be scheduled such that disturbance of grizzly bears resulting from road use is minimized. The appropriate scale for scheduling harvest activities would be determined pursuant to project level consultation.

78. The Wildlife Service's 2011 Biological Opinion recommended that "The (Forest Service) develop, in coordination with the (Wildlife) Service and the IGBC, a strategy addressing point source disturbances (e.g., helicopter logging, mining, etc.)."

79. The Wildlife Service has declared that "[i]f human related disturbances such as road use or timber harvest continue in preferred habitats for extended periods of time, historical bear use of the area may be lost . . . ."

**Complaint** **Page 25**

80.  The 1993 Grizzly Bear Recovery Plan stated that "at some point in time, probably associated with the degree of stress, grizzly bears will no longer use certain portions of their former range. Therefore, each new action has the potential of being 'the last straw' from the standpoint of the bear . . ."

81.  The Wildlife Service has noted the detrimental effects of logging in particular:

> Timber management programs may negatively affect grizzly bears by (1) removing thermal, resting, and security cover; (2) displacement from habitat during the logging period; and (3) increases in human/ grizzly bear confrontation potential or disturbance factors as a result of road building and management. New roads into formerly unroaded areas may cause bears to abandon the area.

82.  Moreover, the Wildlife Service concluded over 15 years ago that "high open and total road densities in [some] areas [of the Forest] are impairing essential behavioral patterns, increasing mortality risk, and resulting in significantly less use of habitat than expected . . . ."

83.  Instead of refraining from logging and road-building in occupied grizzly bear habitat until the bear shows signs of recovery or at least stabilization, the Forest Service approved the Pilgrim Creek Project, a road-building and commercial logging project in occupied bear habitat.

84.  The Pilgrim Creek Project area is located within the Kootenai National Forest in Sanders County, Montana. The Pilgrim Creek watershed is contained in the project area boundary, and is located south of the Clark

**Complaint**                                              **Page 26**

Fork River, and the town of Noxon, Montana. The project area

encompasses approximately 36,602 acres, of which approximately 29,987

acres are National Forest System lands. Pilgrim Creek Project EIS at 1-1.

85.    The project area includes Pilgrim Creek and its tributaries: Fourmile

Gulch, Baxter Gulch, Telegraph Creek, Skeleton Creek, West Fork

Pilgrim and South Fork Pilgrim, as well as Smeads Creek, Stevens Creek,

and smaller tributaries, some of which drain directly into the Clark Fork

River. Pilgrim Creek Project EIS at 1-1.

86.    The project area boundary encompasses all or part of two Inventoried

Roadless Areas (IRAs); Huckleberry Mountain and Lone Cliff Smeads,

which totals approximately 14,000 acres. There are an additional three

IRAs adjacent or in close proximity to the project area. Pilgrim Creek

Project EIS at 3-277.

87.    Whitetail deer, mountain lion, elk, moose, black bear, as well as many

other wildlife species inhabit this area. Gray wolves and grizzly bears are

known to be at least occasional visitors to the area. Native fish species

within the Pilgrim project area include westslope cutthroat trout, bull

trout, large scale sucker, long nose dace, mountain whitefish, and slimy

sculpin. Pilgrim Creek Project EIS at 1-1.

88.    The Project Area is outside the grizzly bear recovery zone, although the

grizzly bear is suspected to occur there. All 29,987 acres of national forest land in the Project Area fall within the 101,685 acre Clark Fork BORZ. Pilgrim Creek Project EIS at 3-115, 117.

89.    The existing condition in the Clark Fork BORZ has resulted in reduced habitat effectiveness on 39,115 acres due to disturbance from existing point source disturbances, such as human use on currently open roads. This leaves 62,570 acres of undisturbed habitat, 14,000 acres of which is in Inventoried Roadless Areas. Pilgrim Creek Project EIS at 3-117.

90.    On May 7, 2013, the Kootenai National Forest Supervisor signed a Record of Decision authorizing Alternative 3 of the Project EIS. Implementation of Project activities will require 4.7 miles of new, permanent road construction, 47 miles of road reconstruction, and 1.1 miles of new, temporary road construction to facilitate logging activities. Pilgrim Creek Project ROD at 1, 2.

91.    Because open road density in the Project area already exceeds Forest Plan Standards, and because Project activities will drive road densities even higher, the ROD also authorized a site-specific Open Road Density Amendment to the Forest Plan that will allow open road densities to reach 2.6 miles per square mile in the Project area. Pilgrim Creek Project ROD at 2.

92.    The Forest Service is implementing its Forest Plan "Access Amendments" for this Project, as jointly authorized by the Forest Service and Wildlife Service. Pilgrim Creek Project ROD at 20.

93.    The Wildlife Service's own ESA §7 Handbook outlines when a "likely to adversely affect" determination is the correct determination in a Biological Assessment:

> **Is likely to adversely affect -** the appropriate finding in a biological assessment (or conclusion during informal consultation) if *any* adverse effect to listed species may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions, and the effect is not: discountable, insignificant, or beneficial (see definition of "is not likely to adversely affect"). In the event the overall effect of the proposed action is beneficial to the listed species, but is also likely to cause some adverse effects, then the proposed action "is likely to adversely affect" the listed species.

94.    The ESA §7 handbook also clarifies that a not likely to adversely affect "finding can be made only if ALL of the reasonably expected effects of the proposed action will be beneficial, insignificant, or discountable." ESA §7 Handbook at 82; *see also* Endangered Species Consultation Handbook  at B-56 (providing example whereby "[e]ven though the net effect [of the project] will be highly beneficial to the listed species, the [project] must be considered to have an adverse effect").

95.    The Forest Service admits that "Human activity within proposed harvest units and along roads has the potential to disturb grizzly bears. These

disturbances disrupt a grizzly bear's living patterns, such as the amount of time spent feeding or resting. Ultimately these repeated disruptions may reduce the health and fitness of a bear." Pilgrim Creek Project EIS at 3-115.

96.     The Forest Service admits that "The point source disturbances from timber harvest actions may temporarily displace grizzly bears under each of the action alternatives while the project is active. … Displacement from an area will likely occur when harvest activity is occurring in the units, resulting in a disturbance that moves around the project area."  Pilgrim Creek Project EIS at 3-118; BA at 10. The Project would result in 2,664 acres of potentially reduced habitat quality due to those point source disturbances. Pilgrim Creek Project EIS at 3-118. The Pilgrim Creek Project Biological Assessment erroneously lists this figure as only 1,176 acres—the number the EIS attributes to Alternative 5 (not chosen).

97.     The Forest Service admits that "Grizzly bears may be displaced from habitat adjacent to roads during hauling on new or previously closed roads."  The Project would result in 2,101 acres of potentially reduced habitat quality due to motorized activity on roads.  Pilgrim Creek Project EIS at 3-118. The Pilgrim Creek Project Biological Assessment erroneously used the Alternative 5 acreage — 822.

**Complaint**                                    **Page 30**

98.    The Forest Service admits that "It is reasonable to assume that loss of

cover from this project coupled with increased recreational use may

increase mortality risk" for grizzly bears. Pilgrim Creek Project EIS at 3-

119.

99.    The Forest Service distinguishes between national forest system roads and

national forest system trails thus: "The Forest Transportation System is

comprised of the National Forest System roads (NFSR), National Forest

System trails (NFST), and airfields on National Forest System (NFS) lands

(36 CFR 212.1). These roads and trails are also referred to as travel

routes." Access Amendment DEIS at 115.

100.    The Forest Service further distinguishes between national forest system

roads and national forest system trails:

For the purpose of this document, travel routes and the level of
wheeled motorized vehicle access on these travel routes, are defined by
the Interagency Grizzly Bear Committee (IGBC) Task Force Report
titled *Grizzly Bear/Motorized Access Management* (IGBC 1998b) and
the *Interim Access Management Rule Set* approved by the
Selkirk/Cabinet-Yaak Subcommittee (IGBC 1998a). Following are
IGBC definitions for roads and trails, which are also found in the
Glossary:
• Road - all created or evolved routes that are greater than 500 feet
long, which are reasonably and prudently drivable with a conventional
passenger car or pickup.
• Trail - all created or evolved access routes that do not qualify as a
"road." They are not reasonably and prudently drivable with a
conventional passenger car or pickup. (Id.)

101.    The Forest Service also defines a road as "A general term denoting a way
for purposes of travel by vehicles greater than 50 inches in width. (FSM
2355.05)". Pilgrim Creek Project EIS Glossary.

102.    The Forest Service states: "The existing condition in the Clark Fork BORZ
polygon includes 177 miles of open motorized routes and 251 miles of
total motorized routes." Pilgrim Creek Project EIS at 3-116-117.

103.    The Forest Service based that figure of 251 miles of existing total
motorized routes on a project file document dated December 8, 2010,
where it stated that "*Road* Miles in BORZ Existing Condition = 251.1
miles." Project File Volume 6 Doc. 002 (emphasis added.)

104.    On May 11, 2006 the Forest Service stated that "There are approximately
19.5 miles of currently maintained trail within the Pilgrim Planning Area.
None of the trails has a Motorized Restriction code assigned to them at this
time." Pilgrim Planning Area Travel Routes Analysis Report at 20. The
Forest Service admits that "Motorized use is allowed on these trails…"
Pilgrim Creek Project EIS at 3-291.

105.    On February 20, 2013 the Forest Service stated that "The access
management baseline conditions for the Clark Fork BORZ polygon are
177 miles of open motorized routes and 256 miles of total motorized
routes." Pilgrim Creek Project Biological Assessment at 9.

**Complaint**                                    **Page 32**

106.   The Forest Service states that during project activities, the Total Motorized

Routes in the Clark Fork BORZ would increase by 4.7 miles, from 256

miles to 260.7 miles. Pilgrim Creek Project Biological Assessment at 9.

107.   The Forest Service states that this increase of 4.7 miles is from "4.7 miles

of new permanent road construction." ROD at 2; ROD Map Pilgrim

Timber Sale Project: Alternative 3; Pilgrim Creek Project EIS at 2-15, 17,

22, 54.

108.   Despite the fact that there would be 4.7 miles of new permanent roads, the

Forest Service claims that after project activities, the Total Motorized

Routes in the Clark Fork BORZ would revert back to 256 miles because

the Forest Service will install berms on certain roads, and roads with berms

would not count in the total linear miles of roads in the BORZ. Pilgrim

Creek Project Biological Assessment at 9.

109.   The Forest Service states that "*All newly constructed* and currently

restricted roads opened for timber haul would have restrictions for public

motorized access to minimize impacts to big-game habitat effectiveness.

Gates would be installed with the road construction and reconstruction in

the timber sale contracts. Following harvest activities, roads would be

*restricted* to meet motorized route density standards, and motorized access

would return to pre-project conditions." Pilgrim Creek Project EIS at 2-46 (emphasis added).

110.    The Pilgrim EIS Glossary defines a restricted road as "A National Forest road or segment which is restricted from a certain type of use or all uses during certain seasons of the year or yearlong. The use being restricted and the time period must be specified. The closure is legal when the Forest Supervisor has issued an Order and posted that Order in accordance with 36 CFR 261."

111.    The Forest Service defines Total Motorized Routes as including "open roads, restricted roads, and motorized trails." Pilgrim Creek Project Biological Assessment at 9.

112.  On May 17, 2017, the Ninth Circuit Court of Appeals held that the miles of road behind earthen berms are not included in the calculation of linear miles of total roads in BORZ areas for the purpose of determining compliance with the Access Amendments "no increase" standard. *See Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238 (9th Cir. 2017).

113.  However, the Ninth Circuit further held that "any closure that fails to effectively prevent motorized access also fails to comply with Standard II(B) of the Access Amendments." *Id.* at 1243.

114.  In other words, so long as a berm is actually preventing motorized use, the

road need not be counted in the calculation of total miles of road.  Thus, if a new road is added but then bermed before a project is completed, there is no unlawful increase in total road miles in a BORZ so long as the berm prevents motorized use.  However, if the berm is not effectively preventing motorized use, then it must be added to the calculation of total roads, and would constitute an unlawful increase in total miles of roads.

115.  Since the Ninth Circuit issued its clarifying opinion in *Bradford*, Alliance has provided the Forest Service with photographic evidence that numerous earthen berms on the Kootenai National Forest in the Clark Fork BORZ and Tobacco BORZ fail to effectively prevent motorized access.

116.  For example, the 60-Day Notice provided evidence that an offshoot of Road #2704 in the Clerk Fork BORZ has evidence of motorized use over and behind a berm:



In another example, the 60-Day Notice provided evidence that Road #430

in the Clark Fork BORZ has an obvious motorized trail around a berm:



117. These two examples are just two among the numerous roads with berms that are ineffective at preventing motorized use in the Clark Fork BORZ and the Tobacco BORZ on the Kootenai National Forest that were included in the 60-Day Notice.

118. The Forest Service has taken no action to respond to the notice that its berms are ineffective at prohibiting motorized use.

# VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Because numerous earthen berms in the Clark Fork and Tobacco BORZ fail to effectively prevent motorized access, and because there are a number of non-barriered roads on the landscape that are not included in the Forest's database, the Forest Service has unlawfully increased permanent total roads above the Access Amendment baseline and thus fails to comply with Standard II(B) of the Access Amendments, which violates the Forest Plan, the National Forest Management Act, and the National Environmental Policy Act.**

119.    All previous paragraphs are incorporated by reference.

120.    The Access Amendment Forest Plan standard II. B. requires that "The Forest shall ensure no net permanent increases in linear miles of total roads in any individual BORZ area above the baseline conditions. …[P]otential increases in linear miles of total roads must be compensated for with in-kind reductions in linear total road miles concurrently with, or prior to, new road construction or reconstruction of currently bermed or barriered roads."

121.    The Forest Service is now aware that multiple berms are ineffective at preventing motorized use, which means that in multiple areas, including the Pilgrim Project area, the Forest Service has unlawfully increased total miles of roads above the applicable BORZ baselines.  This represents a violation of the Access Amendments according the Ninth Circuit's opinion in *Bradford*.

122.    The Forest Service's failure to comply with Access Amendment Forest

Plan Standard II(B), and acknowledge that numerous earthen berms are

ineffective at preventing motorized access, violates NEPA and NFMA.


### SECOND CLAIM FOR RELIEF

**Because numerous earthen berms are ineffective at preventing motorized use, there is unpermitted "take" of the threatened Cabinet-Yaak grizzly bear in violation of Section 9 of the ESA, and the agencies must reinitiate consultation on the Access Amendments and Pilgrim Project because the original analyses presumed no motorized access would occur behind berms and that assumption has proven false.**

123.    All previous paragraphs are incorporated by reference.

124.    The APA requires that the Forest Service and Wildlife Service base their

decisions on substantial supporting evidence in the record. Decisions

cannot be contrary to the evidence in the record and cannot fail to consider

an important factor. There must be a rational connection between the facts

in the record and the decision.

125.    Section 9 of the ESA forbids any individual from "taking" an ESA-listed

species. "Take" is defined to include "harass." "Harass" is defined as an

"intentional or negligent act . . . which creates the likelihood of injury to

wildlife by annoying it to such an extent as to significantly disrupt normal

behavioral patterns which include, but are not limited to, breeding, feeding,

or sheltering."

126.   The Forest Service is permitted to cause incidental "take" of grizzly bears in the Cabinet-Yaak Grizzly Bear Recovery Zone in accordance with the terms of the October 18, 2011 Incidental Take Statement (ITS). If the Forest Service does not comply with those terms, the take is not permitted absent a new formal biological opinion and incidental take statement.

127.   The 2011 ITS states, "In the BORZ, permanent increases in linear miles of open road and/or permanent increases in linear miles of total road beyond the standards in Table 4 of this biological opinion will result in levels of take that exceed the amount of incidental take we anticipate here, and reinitiation of consultation would be required."

128.   Because numerous earthen berms in the Clark Fork and Tobacco BORZ are ineffective at preventing motorized access, the Forest Service violates Standard II(B) of the Access Amendments, violates the terms of the ITS, and thus violates the ESA.

129.   The agencies must reinitiate consultation on the Access Amendments and the Pilgrim Project because the original consultation presumed no motorized access would occur behind berms and that assumption has proven false. The evidence presented to the Forest Service both in the 60-Day Notice and in this Complaint indicates that numerous berms are ineffective at preventing motorized access, thus violating Standard II(B) of the Access

Amendments. *See Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238

(9th Cir. 2017).

## VIII. RELIEF REQUESTED

For all of the above stated reasons, Plaintiff requests that this Court award the following relief:

A.    Declare that the Pilgrim Project violates the law;

B.    Enjoin implementation of the Project;

C.    Require reinitiation of consultation on the Access Amendments and the Pilgrim Project;

D.    Award Plaintiff its costs, expenses, expert witness fees, and reasonable attorney fees under the ESA or under EAJA; and

E.    Grant Plaintiff any such further relief as may be just, proper, and equitable.

Respectfully submitted this 6th day of April, 2018.


/s/ Timothy M. Bechtold

Rebecca K. Smith

Attorneys for Plaintiff