Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, P.C.
P.O. Box 7584
Missoula, MT 59807
406.531.8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
406-721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES | CV-18-67-DWM |
| Plaintiff, | |
| | BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| CHERYL PROBERT, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INDEX OF ADMINISTRATIVE RECORD CITATIONS. . . . . . . . . . . . . . . . . . v

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  In order to prevent the extinction of the Cabinet-Yaak grizzly population,
        the Forest Service must implement an effective road management strategy
        on National Forest lands in Cabinet-Yaak grizzly habitat . . . . . . . . . . . . 5

    B. The agencies must reinitiate ESA consultation on the Access
        Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.  Reinitiation of consultation is required under subsection (a) because
            the amount or extent of taking specified in the incidental take
            statement is exceeded on a recurring basis. . . . . . . . . . . . . . . . . . . 19

        2.  Reinitiation of consultation is required under subsection (b) because
            new information reveals effects of the action that may affect listed
            species in a manner or to an extent not previously considered. . . . 24

        3. Reinitiation of consultation is required under subsection (c) because the
            action has been modified in a manner that causes an effect to the
            listed species that was not considered in the biological opinion . . . 34

4.  Any doubt pertaining to any one of these arguments must be resolved in favor of the grizzly bear, not the agencies.. . . . . . . . . . . . . . . . 36

C.  The agencies must reinitiate ESA consultation on the Pilgrim Project. . . . 36

D.  The Forest Service must prepare a supplemental EIS for the Pilgrim Project. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

TABLE OF AUTHORITIES

*Alaska Wilderness League v. Kempthorne,* 548 F.3d 815 (9th Cir. 2008), vacated as

    moot, 559 F.3d 916 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Alliance for the Wild Rockies v. Bradford*,

    720 F.Supp.2d 1193 (D. Mont. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*All. for the Wild Rockies v. USDA,* 772 F.3d 592 (9th Cir. 2014) . . . . . . . . . . . . 15

*California v. U.S. Dept. of Agriculture,* 575 F.3d 999 (9th Cir. 2009) . . . . . . . . 39

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,

    698 F.3d 1101 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

 *Connor v. Burford,* 848 F.2d 1441 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . 4, 36

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*

    789 F.3d 1075 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Cottonwood Envtl. Law Ctr. v. USFS,* 789 F.3d 1075 (9th Cir.2015) . . . . . .  passim

*Friends of the Clearwater v. Dombeck,* 222 F.3d 552 (9th Cir. 2000) . . . . . . . . . 5

*Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006). . . . . . . . . . . . . . . . 14

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*

    378 F.3d 1059 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25, 30

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*,

    230 F.Supp.3d 1106 (N.D. Cal. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Klamath-Siskiyou Wildlands Center v. Boody,*

    468 F.3d 549 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41, 43

*Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360 (1989) . . . . . . . . . . . . . . . 5, 17

*Native Ecosystems Council v. Krueger*, 946 F.Supp.2d 1060 (D. Mont. 2013). . . 16

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010) . . . . . . . . . 41

*N. Alaska Envtl. Ctr. v. Kempthorne,*

    457 F.3d 969 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25, 30, 31, 33

*Pacifans for a Scenic Coast v. California Dep't of Transportation*,

    204 F.Supp.3d 1075 (N.D. Cal. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rock Creek All. v. U.S. Fish & Wildlife Serv.,*

    390 F.Supp.2d 993 (D. Mont. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 36

*Sierra Club v. Marsh,* 816 F.2d 1376 (9th Cir. 1987). . . . . . . . . . . . . . . 17, 18, 25

*Tennessee Valley Authority v. Hill,* 437 U.S. 153 (1978) . . . . . . . . . . . . . . . . 4, 36

*U.S. Forest Service v. Cottonwood Environmental Law Center,*

    137 S.Ct. 293 (Oct. 11, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

STATUTES

5 U.S.C. §706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. §1540(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. §1604(d)(2)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. §4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

REGULATIONS

40 C.F.R. §1502.9(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42, 43

40 C.F.R. §1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

40 C.F.R. §1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

50 C.F.R. §402.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

# INDEX OF EXHIBITS

EXHIBIT 1        1993 USFWS Grizzly Bear Recovery Plan (Excerpts)

EXHIBIT 2        Schwartz et al. 2010. Hazards Affecting Grizzly Bear Survival
                 in the Greater Yellowstone Ecosystem. Journal of Wildlife
                 Management 74(4):654-667.

EXHIBIT 3        Kendall et al. 2016. Density, Distribution, and Genetic
                 Structure of Grizzly Bears in the Cabinet-Yaak Ecosystem.
                 Journal of Wildlife Management 80(2):314-331.

EXHIBIT 4        USFWS Cabinet-Yaak and Selkirk Mountains Grizzly Bear
                 Monitoring Update (November 8, 2018)

EXHIBIT 5        USFWS 1995 Incidental Take Statement for the Kootenai
                 National Forest 1987 Forest Plan

# INDEX OF ADMINISTRATIVE RECORD CITATIONS

AR 4      Forest Service Post-Litigation Memo Regarding Clark Fork Zone Closure
          Violations (February 14, 2019)

AR 8      Amended Record of Decision - Pilgrim Project (July 1, 2014)

AR 11     Draft EIS - Pilgrim Creek Project (Chapter 3)

AR 12     Final EIS - Pilgrim Creek Project (Chapter 4 & Appendices, Including
          Biological Assessment and Letter of Concurrence)

AR 14     Record of Decision - Pilgrim Project (May 1, 2013)

AR 41     Record of Decision - Kootenai Revised Forest Plan (January 5, 2015)

AR 42     Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones, 2016 Annual Access
          Amendment Monitoring Summary Report, Kootenai, Lolo and Idaho
          Panhandle National Forests (April 14, 2017)

AR 43     Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones, 2017 Annual Access
          Amendment Monitoring Summary Report, Kootenai, Lolo and Idaho
          Panhandle National Forests (July 18, 2018)

AR 237    Forest Service Post-Litigation Memo Regarding Tobacco Zone Closure
          Violations (February 19, 2019)

AR 279    Forest Service Post-Litigation Letter to USFWS Regarding Clark Fork
          and Tobacco Zone Closure Violations (February 25, 2019)

AR280     USFWS Post-Litigation Letter to Forest Service Regarding Clark Fork
          and Tobacco Zone Closure Violations (March 7, 2019)

AR 282    Final Supplemental EIS - Access Amendment (November 1, 2011)

AR 283    Final Record of Decision - Access Amendment (November 1, 2011)

AR 284   Biological Opinion & Incidental Take Statement - Access Amendment
(October 18, 2011)

AR 302   USFWS Cabinet-Yaak Grizzly Bear Recovery Area 2017 Research and
Monitoring Progress Report (2018)

AR 303   Wancour Declaration Regarding Independent Investigation of Road
Closure Violations in Clark Fork and Tobacco Zone (May 9, 2018)

AR 404   Photograph #2704 - Cited in Wancour Declaration Regarding
Independent Investigation of Road Closure Violations in Clark Fork and
Tobacco Zone (May 9, 2018)

# I.  INTRODUCTION

Two months ago, the mountain caribou went extinct in the lower 48 states. The
Washington Post[1] reports that after years of struggling with a small population size
of only 50 animals, the species could no longer survive the habitat fragmentation
from logging, roads, and powerlines in northern Idaho and northeastern Washington.
Although the mountain caribou was an endangered species listed under the
Endangered Species Act and found primarily on federal public lands, the federal
agencies tasked with protecting this species failed to prevent its extinction.

Plaintiff Alliance for the Wild Rockies (Alliance) brings this case to avoid the
same fate for Cabinet-Yaak grizzly bears.  Like the mountain caribou's habitat,
Cabinet-Yaak grizzly habitat is also fragmented by logging, roads, powerlines, and
mining.  As a result, this extremely small population of less than 50 individuals is
isolated, failing recovery targets, and suffering from extremely high mortality rates.
This population is "in danger of extinction" and warrants uplisting from threatened
to endangered status.

In this case, Alliance seeks updated environmental analysis for the "Forest Plan
Amendments for Motorized Access Management within the Selkirk and
Cabinet-Yaak Grizzly Bear Recovery Zones," which are also referred to as the

---

[1]https://www.washingtonpost.com/science/2019/03/22/americas-reindeer-hav
e-quietly-gone-extinct-lower/?utm_term=.b92f88358b4c

"Access Amendment." The Access Amendment is the product of years of public interest litigation on behalf of the imperiled Cabinet-Yaak grizzly bear. The well-established scientific consensus is that roads pose the most imminent risk to this grizzly population. Ninety percent of this population's Recovery Zone habitat is located on public National Forest lands. Thus, the federal government has the power to limit road density for grizzly bear protection on the vast majority of its habitat and thereby prevent the extinction of this grizzly population. Ostensibly, this is the purpose of the Access Amendment.

However, since the Access Amendment was approved in 2011, the U.S. Forest Service has prepared multiple years of monitoring reports regarding its implementation of road closures in grizzly habitat. These monitoring reports establish that these road closures are routinely violated and therefore ineffective: members of the public regularly ignore signs, drive around gates or earthen berms, remove obstructions such as boulders or logs, or simply create their own new motorized routes.

Although these monitoring reports are only required for the Recovery Zone, there are incidental observations in these reports regarding closure violations found in grizzly habitat outside of the Recovery Zone, in the government-designated

"Bears Outside Recovery Zone" or "BORZ" areas.[2]  In 2017, Alliance hired its own

investigators to determine whether there were road closure violations in these areas.

Due to time and funding constraints, this initial investigation was limited in scope to

the Tobacco and Clark Fork "Bears Outside Recovery Zone" areas.  As a result of

one visit to each required closure device in these two areas, the investigators

discovered numerous failed closure devices, roads that were categorized as closed

but were open upon inspection, and illegal user-created roads that were simply

unaccounted for in the Forest Service road databases.   Thus, the independent

investigation confirms the fact that these road closures are routinely violated both

inside and outside the Recovery Zone.

The recurring problem of road closure failures undermines the foundation of

the Access Amendment management regime, which relies on these road closures to

achieve certain densities of open and total roads both inside and outside the

Recovery Zone.  The agencies must address this problem and its impacts in an

updated ESA consultation for the Access Amendment.  The agencies must also

address this problem and its impact in an updated ESA consultation and

---

[2]The agencies refer to these areas as "BORZ" areas.  However, this Court
issued an Order stating: "In all documents filed with the Court, the parties shall not
use any acronyms except for the following commonly understood acronyms in
record review cases: NEPA, NFMA, APA, ESA, EIS, and EA."  Doc. 3 at 5.
Accordingly, outside of direct quotations, Alliance will use the term "Zone" in the
place of "BORZ."

supplemental EIS for the site-specific Pilgrim Project on the Kootenai National
Forest.

## II. STATEMENT OF FACTS

Pursuant to Local Rule 56.1, the relevant facts are set forth in Alliance's
Statement of Undisputed Facts.

## III. STANDARDS OF REVIEW

This is an action brought primarily under the ESA. 16 U.S.C. §1540(g). The
Supreme Court holds that the preservation of endangered species like the Cabinet-
Yaak grizzlies takes "priority over the 'primary missions' of federal agencies."
*Tennessee Valley Authority v. Hill*, 437 U.S. 153, 187 (1978). Thus, the
government must "afford[] endangered species the highest of priorities" and act with
"institutionalized caution" regarding these species. *Cottonwood Envtl. Law Ctr. v.
USFS*, 789 F.3d 1075, 1091 (9th Cir.2015). Moreover, reviewing courts must "give
the benefit of the doubt to the species." *Connor v. Burford*, 848 F.2d 1441,1454
(9th Cir.1988). As this Court has previously held, this means that a "tie in the
evidence should go to the species . . . ." *Rock Creek All. v. U.S. Fish & Wildlife
Serv.*, 390 F.Supp.2d 993, 1008 (D. Mont. 2005).

Additionally, the portion of this action that seeks to compel a supplemental EIS
for the Pilgrim Project is brought pursuant to the Administrative Procedure Act,
which mandates that a "reviewing court shall [] (1) compel agency action unlawfully

withheld . . . ." 5 U.S.C. §706(1); *see also Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) ("An action to compel an agency to prepare an SEIS, however, is . . . an action arising under 5 U.S.C. §706(1), to 'compel agency action unlawfully withheld or unreasonably delayed'")(citation omitted).  The Supreme Court holds that "in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

## IV.  ARGUMENT

**A.  In order to prevent the extinction of the Cabinet-Yaak grizzly population, the Forest Service must implement an effective road management strategy on National Forest lands in Cabinet-Yaak grizzly habitat.**

The majority of the Cabinet-Yaak Grizzly Bear Ecosystem – 90% – is National Forest land, managed by the Forest Service.  64 Fed. Reg. 26725, 26728 (May 17, 1999).  In terms of all of the human uses that affect grizzly bears, "[r]oads probably pose the most imminent threat to grizzly habitat today [].  The management of roads is one of the most powerful tools available to balance the needs of people with the needs of bears."  Exhibit 1 at 21.  Accordingly, the U.S. Fish & Wildlife Service (FWS) states:  "It is strongly recommended that road management be given the

highest priority within all recovery zones." Exhibit 1 at 21.

Roads pose a threat to grizzly bears because roads provide humans with access into grizzly bear habitat, which leads to direct bear mortality from accidental shootings and intentional poachings. Exhibit 1 at 22. Human access also leads to indirect bear mortality by creating circumstances in which bears become habituated to human food and are later killed by wildlife managers. Exhibit 1 at 145. Human access also results in indirect mortality by displacing grizzly bears from good habitat into areas that provide sub-optimal habitat conditions. Exhibit 1 at 145-147.

Displacement may have long term effects: "Females who have learned to avoid roads may also teach their cubs to avoid roads. In this way, learned avoidance behavior can persist for several generations of bears before they again utilize habitat associated with closed roads." Exhibit 1 at 146. Both open and closed roads displace grizzly bears: "grizzlies avoided roaded areas even where existing roads were officially closed to public use []. Females with cubs remained primarily in high, rocky, marginal habitat far from roads. Avoidance behavior by bears of illegal vehicular traffic, foot traffic, and/or authorized use behind road closures may account for the lack of use of areas near roads by female grizzly bears in this area. This research demonstrated that a significant portion of the habitat in the study area apparently remained unused by female grizzlies for several years. Since adult females are the most important segment of the population, this lack of use of both

open-roaded and closed-roaded areas is significant to the population." Exhibit 1 at 146.

In addition to having a significant impact on female grizzly bears, displacement may also negatively impact the survival rates of grizzly cubs: "survivorship of the offspring of females that lived in unroaded, high elevation habitat was lower than that recorded in other study areas in the [Northern Continental Divide Ecosystem]. The majority of this mortality was due to natural factors related to the dangers of living in steep, rocky habitats. This is important in that the effects of road avoidance may result not only in higher mortality along roads and in avoidance of and lack of use of the resources along roads, but in the survival of young when their mothers are forced to live in less favorable areas away from roads." Exhibit 1 at 146.

Current peer-reviewed science still finds that roads have the most significant impact on grizzly bear survival: "[o]f all the covariates we examined, the amount of secure habitat and the density of roads in nonsecure habitat on public lands had the greatest effect on grizzly bear survival." Exhibit 2 at 665.

In 1999, FWS found that the Cabinet-Yaak grizzly population was "in danger of extinction" due in part to the habitat alteration and human intrusion related to the cumulative impacts of timber harvest and its associated road construction. 64 Fed. Reg. 26732. Today, twenty years later, the Cabinet-Yaak grizzly population is still facing the same threats and still warranted for uplisting from "threatened" to

"endangered." *All. for the Wild Rockies v. Zinke*, 265 F.Supp.3d 1161, 1182 (D.

Mont. 2017).

The only peer-reviewed, published scientific journal article that estimates the

Cabinet-Yaak grizzly population size found that when the DNA evidence was added

to all other evidence of known Cabinet-Yaak grizzly bears, the researchers

"detected 42 [Cabinet-Yaak] grizzly bears." Exhibit 3 at 320. The researchers

estimate that the "average number of grizzly bears present" is 44 bears. Exhibit 3 at

323. The verified "super-population" estimate, which includes all full-time resident

bears as well as"part-time" residents using the area, is 48 bears. Exhibit 3 at 323. In

turn, FWS's most recent monitoring report for this population, which was published

in 2018 for the 2017 monitoring year, indicates detections of 35 actual bears, but

estimates the population at 46 bears based on modeling. AR302:004025, 004039.

However, the minimum population necessary for recovery is 100 bears. Exhibit 1 at

83.

FWS's most recent monitoring report also find that in the 17-year period from

1982-1998, there were 16 known mortalities, and 12 mortalities were

human-caused, which equates to a known mortality rate of 0.94 bears/year, and a

human-caused mortality rate of 0.71 bears/year. AR302:004055. In contrast, in the

19-year period from 1999-2017, there were 55 known mortalities, and 40 mortalities

were human-caused, which equates to a known mortality rate of 2.89 bears/year and

a human-caused mortality rate of 2.11 bears/year. AR302:004054. Thus, the mortality rate has tripled.

Moreover, the most recent FWS monitoring update indicates that at least three additional Cabinet-Yaak grizzly bears were killed by humans in 2018, as of November 8, 2018, including one female grizzly. Exhibit 4 at 2. FWS finds that recorded deaths paint only a partial picture: "Use of known human-caused mortality counts probably under-estimates total human caused mortality. Numerous mortalities identified by this study were reported only because animals wore a radio-collar at death." AR302:004056. FWS estimates that "known human caused mortality may represent only 50 percent of total human caused mortality in the northern grizzly bear recovery zones." 64 Fed. Reg. 26730.

In addition to an extremely small population size and very high mortality rates, in the monitoring period 2011-2016, the population failed all four of FWS's recovery targets: (1) the targets for females with cubs, (2) the human-caused mortality limit, (3) the female human-caused mortality limit, and (4) the target for distribution of females with young. AR302:004043. Regarding the mortality limits, the 1993 Recovery Plan mandates: "For the present [Cabinet-Yaak Ecosystem] population estimate, the annual goal is zero known, human-caused mortality. The female mortality limit will remain zero until the three key parameters indicate a minimum population of approximately 100 grizzly bears." Exhibit 1 at 85.

In sum, the Forest Service manages 90% of this population's habitat; roads are the primary factor affecting grizzly bear survival; and the Cabinet-Yaak grizzly population is in dire straits. Accordingly, the manner in which the Forest Service manages roads in Cabinet-Yaak grizzly habitat is critical to the survival of this grizzly population. After years of litigation, in 2011, the Forest Service issued its current Record of Decision for the Access Amendment,[3] AR283:001780-1853, and FWS issued its current Biological Opinion and Incidental Take Statement, AR284:001553-1779. Together these documents direct road management in Cabinet-Yaak grizzly habitat. Thus, the manner in which the Access Amendment is implemented will likely determine whether the Cabinet-Yaak grizzly goes extinct like the mountain caribou, or survives and recovers.

## B. The agencies must reinitiate ESA consultation on the Access Amendment.

With some exceptions for individual bear management units, the Access Amendment generally sets the following standards for Cabinet-Yaak grizzly bear habitat within the Recovery Zone: (1) no more than 33% of each Bear Management Unit may have an open motorized route density of over one mile/square mile; (2) no more than 26% of each Bear Management Unit may have a total motorized route density of over two miles/square mile, and (3) at least 55% of each Bear

---

[3]In 2015, the Forest Service adopted a Revised Forest Plan for the Kootenai National Forest, which incorporated the 2011 Record of Decision for the Access Amendment. AR41:002495.

Management unit must be "core" habitat, which is referred to in the shorthand form as "33/26/55." AR283:001788, 1807-1812.

For areas outside the Recovery Zone, but within a "Bears Outside Recovery Zone" area, the Access Amendment sets the following standards: (1) "The Forests shall ensure no increases in permanent linear miles of open road on National Forest System lands in any individual BORZ, above the baseline conditions identified in Table 4 [sic], except in cases where the Forest Service lacks discretion to prevent road building . . . ." and (2) "The Forest shall ensure no net permanent increases in linear miles of total roads in any individual BORZ area above the baseline conditions identified in Table 16, except in case where the Forest Service lacks discretion to prevent road building . . . ." AR283:001847-1848.

Outside the Recovery Zone, the Access Amendment baseline conditions for linear miles of open road are as follows:

| Zone | Linear Miles of Open Roads on National Forest System Lands |
|------|-----------------------------------------------------------|
| Priest | 314.4 |
| Pack River | 37.9 |
| Mission-Moyie | 167.3 |
| Clark Fork | 176.9 |
| Cabinet Face | 128.0 |
| West Kootenai | 315.9 |

| Tobacco | 867.0 |
|---|---|

AR284:001571.

Outside the Recovery Zone, the Access Amendment baseline conditions for linear miles of total roads are as follows:

| Zone | Linear Miles of Total Roads on National Forest System Lands |
|---|---|
| Priest | 316.4 |
| Pack River | 41.9 |
| Mission-Moyie | 200.3 |
| Clark Fork | 256.1 |
| Cabinet Face | 164.1 |
| West Kootenai | 615.3 |
| Tobacco | 1123.9 |

AR284:001571.

In the Access Amendment Biological Opinion, FWS uses certain habitat conditions as the surrogate to represent incidental take of female grizzly bears. AR284:001660, 1662. Regarding the Recovery Zone, FWS states: "Based on the best available research and information, we anticipate that some level of incidental take of female grizzly bears will occur within individual BMUs as long as: 1) OMRD exceeds one mile per square mile in more than 33 percent of a BMU; 2) TMRD exceeds two miles per square mile in more than 26 percent of a BMU,

and/or 3) core area makes up less than 55 percent of a BMU." AR284:001661.

Regarding the areas outside the Recovery Zone, FWS states: "we anticipate a low level of incidental take of female grizzly bears in the BORZ in the form of harassment, and /or harm through significant habitat modification or degradation (roads and associated disturbance), which causes actual injury to grizzly bears by significantly disrupting normal behavioral patterns, to the extent that a female's normal reproductive potential is impaired. In the BORZ (BA 2010), we use the surrogate measure of the existing (2010) linear miles of road in each BORZ polygon." AR284:001662.

Although a Biological Opinion/Incidental Take Statement was issued for the Access Amendment in 2011, it is not set in stone. Instead, the agencies must continually ensure that their analysis is factually and scientifically accurate; thus, the ESA implementing regulations require the following:

> Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:
>
> (a) If the amount or extent of taking specified in the incidental take statement is exceeded; [or]
>
> (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; [or]
>
> (c) If the identified action is subsequently modified in a manner that

causes an effect to the listed species or critical habitat that was not considered in the biological opinion;

    . . . .

50 C.F.R. §402.16.

The requirement to reinitiate ESA consultation under 50 C.F.R. §402.16 applies to forest plan amendments. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1085 (9th Cir. 2015);[4] *see also Forest Guardians v. Johanns*, 450 F.3d 455, 465 (9th Cir. 2006).

The Ninth Circuit explained the importance of reinitiation of consultation in *Cottonwood*:

> Requiring reinitiation in these circumstances comports with the ESA's statutory command that agencies consult to ensure the "continued existence" of listed species. []. The Forest Service's position in this case would relegate the ESA—"the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," []—to a static law that evaluates and responds to the impact of an action before that action takes place, but does not provide for any further evaluation or response *when new information emerges* that is critical to the evaluation. . . . The Forest Service cannot evade its obligations by relying on an analysis it completed before the protections [at issue] were put in place.

789 F.3d at 1087-88.

---

[4]The Supreme Court denied certiorari regarding this issue. *U.S. Forest Service v. Cottonwood Environmental Law Center*, 137 S.Ct. 293 (Oct. 11, 2016). Subsequently, Congress passed a budget rider that amended the National Forest Management Act to exempt forest plans from subsection (d) in 50 C.F.R. §402.16, which is the provision of the regulation pertaining to new listings of species or critical habitat. *See* 16 U.S.C. §1604(d)(2)(a). Subsection (d) is not at issue in this case. Forest plans are still subject to 50 C.F.R. §402.16(a), (b), and (c), which are the subsections at issue in this case.

In several other cases, either the Ninth Circuit or this Court have addressed the issue of reinitiation of consultation on management plans when there is new information regarding grizzly bears.  For example, in response to litigation, the National Park Service reinitiated ESA consultation on the Interagency Bison Management Plan in order to address the impact on grizzly bears from "the Management Plan's expansion of helicopter hazing operations to the spring and early summer." *All. for the Wild Rockies v. USDA*, 772 F.3d 592, 601 (9th Cir. 2014).  In assessing whether consultation rendered the underlying claim moot, the Ninth Circuit held that "[i]n conducting a second consultation and Biological Evaluation on the impact of the Management Plan on Yellowstone grizzly bears, and obtaining a second concurrence from the FWS, the federal defendants completed the reinitiation of consultation *required* by the ESA." *Id.* (emphasis added).

This Court addressed a similar situation in *Native Ecosystems Council v. Krueger*:

> Since [the 2010 Forest Plan consultation], there have been verified grizzly bear observations in areas outside the action area as it was defined in the 2010 biological opinion. Since the Complaint in this case was filed, the Forest Service has reinitiated consultation to consider the effects of the Forest Plan on grizzly bears in the remaining Forest areas. [].   Plaintiffs argue that Defendants were required to engage in section 7 consultation for the Forest Plan as a whole . . . . By reinitiating consultation on the Forest Plan, the Forest Service has rendered moot at least portions of the Plaintiffs' third claim for relief.

946 F.Supp.2d 1060, 1075-76 (D. Mont. 2013)(emphasis added).

This Court also addressed a similar issue in *Alliance for the Wild Rockies v.*

*Bradford*, when it found that new information indicated a need for a new Incidental

Take Statement:

> In 2003, a Forest Service biologist completed a document . . . . [which] recognizes that grizzly bears have expanded outside the areas identified as recovery zones in the 1993 Recovery Plan, and that the bears have taken up in the areas referred to as the reoccurring use polygon. . . . Based on the analysis of the existing road densities in the reoccurring use polygon, the Forest Service concluded "incidental take of grizzly bear[s] likely is occurring on those portions of the [Kootenai National Forest] outside the recovery area" and "the level of take is higher in these areas than inside the recovery zone," []. . . . Grizzly bears were located only inside the recovery zone and there was no regular use by grizzly bears outside it at the time of the 1993 Recovery Plan and the 1995 Incidental Take Statement. []. . . . The ESA prohibits take, unless an agency is complying with a written incidental take statement from the Fish & Wildlife Service specifying the measures necessary to minimize take. []. There is no such exemption here for the areas outside the recovery zone. Consequently the inescapable conclusion is the projects thus violate § 9.

720 F.Supp.2d 1193, 1209-10 (D. Mont. 2010).

Other courts have addressed similar issues. For example, in *Ctr. for Biological*

*Diversity v. U.S. Bureau of Land Mgmt.*, the Ninth Circuit held that an agency's

failure to enforce promised mitigation/conservation measures amounted to a

modification to the action that triggered reinitiation of consultation under subsection

(c):

where, as in *Marsh*, conservation agreements are part of the project design, the ESA's sequential, interlocking procedural provisions ensure recourse if the parties do not honor *or enforce* the agreement, and so ensure the protection of listed species. First, when a proposed action 'is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion,' the section 7 regulations require reinitiation of formal consultation. 50 C.F.R. §402.16(c). This requirement provides the FWS with the opportunity—and the obligation—to reexamine altered projects to ensure that any changes will not place species in jeopardy or risk degradation to critical habitat. As we held in *Marsh*, *where mitigation measures are not carried out, any risk to listed species thereby created "must be borne by the project, not by the endangered species."* []. Second, where an action agency does not reinitiate consultation with the FWS *despite the failure of promised conservation measures*, the Biological Opinion for the proposed action becomes invalid.

698 F.3d 1101, 1114-15 (9th Cir. 2012)(emphases added)(discussing *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987)).

In *Sierra Club*, the Ninth Circuit held that new information, which indicated that a required land acquisition did not occur, amounted to new information that triggered reinitation of consultation under subsection (b):

The dispute as to the easements and the County's breach of the Section 221 Agreement are certainly "new information" that neither the FWS nor the COE took into account during previous consultations. . . . The FWS issued its last biological opinion with the assumption that the County would transfer the 188 acres without the seven easements. . . . Two events definitely have occurred: the County has failed to transfer the land and it has entered into an escrow agreement conditioned on the reservation of seven easements. . . .This is the exact situation envisioned by the requirements for reinitiation of consultation between agencies found in section 402.16(b).

*Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987); *see also Gifford*

*Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1077 (9th Cir.

2004)("As we have recognized, the discovery of new facts does not justify an

'amendment' to the BiOp, but mandates reinitiating formal consultations."); *N.*

*Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 981 (9th Cir. 2006) ("If future

actions differ from the BiOp assumptions, BLM must reinitiate consultation with the

FWS. *See* 50 C.F.R. §402.16(b)").

In accord with this precedent, district court cases have reached similar

conclusions.  For example, in *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*,

the district court found that both subsection (a) and (b) were triggered: "This first

circumstance was triggered when [disease] rates exceeded the 49 percent amount

outlined in the incidental take statement. The second was triggered when

consecutive drought years 'caused variations in operations and hydrologic

conditions that were not anticipated at the time the Proposed Action was analyzed in

the BiOp' and resulted in much higher infection rates than the NMFS thought

possible."   230 F.Supp.3d 1106, 1130 (N.D. Cal. 2017).

Similarly, in *Pacificans for a Scenic Coast v. California Dep't of*

*Transportation*, the district court found that subsection (b) was triggered: "Caltrans

relied on preservation of the 5.14-acre parcel . . . . The loss of this benefit

necessarily implies that the project's net effect on listed species and their habitat

will be greater than previously thought. [].  The plaintiffs are therefore entitled to a

declaration that Caltrans has a duty to reinitiate consultation under section 7 of the

Endangered Species Act."  204 F.Supp.3d 1075, 1092 (N.D. Cal. 2016)(citations

omitted).

As set forth in more detail below, reinitiation of consultation on the Access

Amendment in this case is triggered under subsections (a), (b), and/or (c).  First, the

recurring and pervasive breaches of road closures since 2011 indicate that permitted

incidental take is exceeded on a recurring basis, thereby triggering reinitiation of

consultation under subsection (a).  Second, eight years of evidence of pervasive and

recurring road closure breaches constitutes new information that reveals new effects

on grizzly bears that were not previously considered, thereby triggering reinitiation

of consultation under subsection (b).  Third,  the agencies' failure to ensure that all

road closures are effective at all times constitutes a modification of the action that

causes an effect to grizzly bears that was not previously considered, thereby

triggering reinitiation of consultation under subsection (c).  Finally, any doubt

pertaining to any one of these arguments must be resolved in favor of the grizzly

bear, not the agencies.

> **1.  Reinitiation of consultation is required under subsection (a) because the amount or extent of taking specified in the incidental take statement is exceeded on a recurring basis.**

"Reinitiation of formal consultation is required and shall be requested by the

Federal agency or by the Service . . . If the amount or extent of taking specified in the incidental take statement is exceeded . . . ."  50 C.F.R. §402.16 (a).  For example, in *Hoopa Valley Tribe*, the district court found that subsection (a) was triggered because disease "rates exceeded the 49 percent amount outlined in the incidental take statement."  230 F.Supp.3d at 1130.

In the Access Amendment Incidental Take Statement, FWS uses certain habitat conditions as the surrogate to represent incidental take of female grizzly bears.  AR284:001660, 1662.  Regarding the areas outside the Recovery Zone, FWS states: "we use the surrogate measure of the existing (2010) linear miles of road in each BORZ polygon" as the surrogate for incidental take.  AR284:001662.  Outside the Recovery Zone, the Access Amendment baseline conditions for linear miles of open road are as follows:

| Zone | Linear Miles of Open Roads on National Forest System Lands |
| --- | --- |
| Priest | 314.4 |
| Pack River | 37.9 |
| Mission-Moyie | 167.3 |
| Clark Fork | 176.9 |
| Cabinet Face | 128.0 |
| West Kootenai | 315.9 |
| Tobacco | 867.0 |

AR284:001571.

Outside the Recovery Zone, the Access Amendment baseline conditions for linear miles of total roads are as follows:

| Zone | Linear Miles of Total Roads on National Forest System Lands |
|------|------------------------------------------------------------|
| Priest | 316.4 |
| Pack River | 41.9 |
| Mission-Moyie | 200.3 |
| Clark Fork | 256.1 |
| Cabinet Face | 164.1 |
| West Kootenai | 615.3 |
| Tobacco | 1123.9 |

AR284:001571.

These baselines have been exceeded multiple times. For example, as a result of Alliance's independent investigation in the Tobacco Zone, the Forest Service now acknowledges that at least 8.1 miles of roads were unlawfully open, which caused the area to exceed the Access Amendment baseline: "In some years breached closure devices have resulted in a BORZ mileage temporarily above the baseline. This occurred in the Tobacco BORZ in Bear Year 2017." AR279:000211. Although the Forest Service argues that this increase was only temporary in the Tobacco Zone, the Forest Service also recognizes that there is still potential for illegal motorized use on several trails on which it took no action to fortify berms. AR237:000236 ("All-Terrain Vehicles or motorcycles could possibly

jump the ditch . . . ."); AR237:000236 ("[a] skilled motorcycle rider may be able to ride over or around one or more of the berms . . . .") AR237:000237.

Likewise, as a result of Alliance's independent investigation in the Clark Fork Zone, regarding Road 14622, the Forest Service does not dispute that the berm was removed, and will not be replaced. AR4:000209. Instead a gate will be installed, which will permanently add 0.35 miles of total road to the calculation for the Clark Fork Zone. AR4:000209. According to the calculations in the Biological Assessment for the Pilgrim Project, an increase of 0.35 miles would increase the post-Pilgrim Project condition from 256.0 miles to 256.4 miles. AR12:000900 Table 3. The Access Amendment baseline is 256.1 miles. AR284:001571. This means that the removal of the berm leads to a permanent increase in total miles of roads above the Access Amendment baseline. AR284:001571.

The Forest Service's own monitoring reports also reach similar findings. For example, in the Priest Lake Zone, during planning for the Hanna Flats logging project, the Forest Service found illegal motorized use on 15.7 miles of road that were not included in the Access Amendment baseline for open or total roads. AR43:000081-82 (note 2). The Forest Service represents that it will not close the 15.7 miles of newly-discovered illegal roads that exceed the Access Amendment baseline until after implementation of the Hanna Flats logging project, which means that the existing condition is above the baseline and will remain so for years.

AR43:000081-82 (note 2).

Likewise, in the Cabinet Face Zone, in 2017, a gate was destroyed, illegal motorized use occurred on roads with barriers, and illegal motorized use occurred on "undetermined," i.e. unauthorized roads. AR43:000082 note 6. The illegal road use in the Cabinet Face Zone increased open miles of road to 138 miles and increased total miles of road to 166.5 miles. AR43:000081. The Access Amendment baseline for the Cabinet Face Zone is 128.0 miles of open road and 164.1 miles of total road, AR284:001571, which means that the condition was or is above baseline.

In the West Kootenai Zone, the current condition is 353.53 miles of open roads and 671.9 miles of total roads. AR43:000082. The Access Amendment baseline for the West Kootenai Zone is 315.9 miles of open roads and 615.3 miles of total roads, AR284:001571, which means that the existing condition is above baseline.

Significantly, these findings represent only a partial picture of the location and duration of illegal motorized use because there is no systematic monitoring required outside of the Recovery Zone. *See* AR43:000080 ("Beginning in 2012, the forests were required to ensure at least 30 percent of all gates and barriers within the respectively [sic] recovery zone are monitored annually.") Thus, the illegal motorized use in these areas is only discovered on an incidental basis by the agency. Accordingly, the full extent and duration of the illegal use that exceeds the Access

Amendment baseline is unknown. However, it is reasonable to assume that (1) this is a recurring problem throughout these areas, (2) some instances of illegal motorized use that exceed the baseline may not be discovered by the agency at all, and (3) other instances of illegal motorized use that are uncovered and found to exceed the baseline may have been ongoing for years prior to discovery, and may persist for years after discovery prior to a remedy.

Therefore, the recurring illegal motorized use that causes an increase in open or total roads above the 2010 baseline results in an increase in incidental take above the amount permitted by the Access Amendment Incidental Take Statement. Thus, subsection (a) has been triggered, and reinitiation of consultation must occur. 50 C.F.R. §402.16 (a); *Hoopa Valley Tribe*, 230 F.Supp.3d at 1130.

### 2. Reinitiation of consultation is required under subsection (b) because new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered.

"Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service . . . If new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered. . . ." 50 C.F.R. §402.16(b). The Ninth Circuit has expressly rejected the notion that the ESA is "a static law that evaluates and responds to the impact of an action before that action takes place, but does not provide for any further evaluation or response when new information emerges that is critical to the

evaluation. . . ." *Cottonwood*, 789 F.3d at 1087-88. The Ninth Circuit holds that both "the discovery of new facts," as well as "actions [that] differ from the BiOp assumptions" trigger reinitiation of consultation. *Gifford Pinchot Task Force*, 378 F.3d at 1077; *N. Alaska Envtl. Ctr*, 457 F.3d at 981. Thus, as noted above, in *Sierra Club*, the Ninth Circuit held that new information, which indicated that an anticipated land transfer did not occur, was "the exact situation envisioned by the requirements for reinitiation of consultation between agencies found in section 402.16(b)." 816 F.2d at 1388.

Likewise, in *Hoopa Valley Tribe*, subsection (b) "was triggered when consecutive drought years 'caused variations in operations and hydrologic conditions that were not anticipated at the time the Proposed Action was analyzed in the BiOp' and resulted in much higher infection rates than the NMFS thought possible." 230 F.Supp.3d at 1130. Similarly, in *Pacificans for a Scenic Coast*, subsection (b) was triggered when the agency failed to secure the preservation of a parcel of land because "[t]he loss of this benefit necessarily implies that the project's net effect on listed species and their habitat will be greater than previously thought." 204 F.Supp.3d at 1092.

In this case, mandatory Forest Service monitoring reports issued beginning in 2012 have uncovered recurring violations of road closures in the Cabinet-Yaak and Selkirk Grizzly Recovery Zones and, incidentally, outside the Recovery Zones as

well. *See, e.g.,* AR43:000073-76, 81-82; AR42:000059-62, 68. For example, in 2017 alone, the Forest Service found 13 violations in the areas outside both Recovery Zones. AR43:000081-82. These violations include the removal of a barrier in the Clark Fork Zone, "user-created bypasses" of barriers on multiple roads in the Tobacco Zone, a "user-created spur," i.e. an illegal user-created road, in the Tobacco Zone, and a gated road found open in the Tobacco Zone. AR43:000082. In the Cabinet Face Zone, a gate was destroyed, illegal motorized use occurred on roads with barriers, and illegal motorized use occurred on "undetermined," i.e. unauthorized roads. AR43:000082.

Within the Cabinet-Yaak Recovery Zone, numerous violations were also documented by the Forest Service in 2017:

- Unit 1: breaches on barriered Roads #691D Camp Creek D and #14352 Springer; evidence of illegal use on Roads 128F and 4727H;

- Unit 2: no barrier on Road 5140; no gate on Road 4791T;

- Unit 6: breach of gate resulting in illegal use on Roads 808 and 808E;

- Unit 16: Road 470 found open;

- Unit 17: gates on Road 251 and 258 were found open;

- Unit 18: gate on Road 2111 was breached;

- Unit 19: breached gate on Road 2236; illegal active all terrain vehicle trail; gates on Roads 2656C and 2656B were breached; and

- Unit 20: gate damaged and ineffective; documented unauthorized use on Road 473; gate on Road 1082 breached.

AR43:000073-76.

Previous years' monitoring reports indicate similar findings. For example, the Forest Service also documented over 20 violations of closures in the Cabinet-Yaak Recovery Zone in 2016 alone:

- Unit 10: breaches on gated Roads 4425 and 4439;

- Unit 11: breach of barriered Road 6132;

- Unit 13: breach on portion of Road 745;

- Unit 14: illegal motorized use on barriered Road 747;

- Unit 15: illegal use of barriered Roads 276A, 5846, 5857, 5886, 747, and 757;

- Unit 16: illegal use of barriered Roads 5800, 6810, 6810I, and 746B;

- Unit 19: boulders placed in 2015 have been removed and unauthorized users are again circumventing gate on Road 2236; an illegal active all terrain vehicle trail in use off Road 2236; and

- Unit 20: gate remained damaged and ineffective; documented unauthorized use on Road 473; gate on Road 2641 circumvented by all terrain vehicle; barrier on Road 1082 breached by all terrain vehicle.

AR42:000059-62.

As noted above, in 2017, Alliance also commissioned an investigation of closure effectiveness outside the Recovery Zone to fill in the gaps in the Forest Service's annual monitoring. Due to time and resource constraints, the investigation was limited to the Clark Fork and Tobacco Zones. AR303:004127. In response to the findings of this investigation, the Forest Service now acknowledges that within the Tobacco Zone, there were "eight road closures that did not effectively prevent motorized access at the time that [the Forest Service] inspected them . . . ." AR237:000235. The Forest Service states that "three berms were . . . ineffective because of illegal removal of the berm or rock barriers or the berm was not initially constructed large enough, three gates were found to be open, and two routes were closed using signage. . . .This signage was illegally removed at the time of my inspection." AR237:000235.

More specifically, as a result of Alliance's investigation, the Forest Service acknowledges the following ineffective road closures:

- Road 7987J: "rocks had been moved and illegal access was achieved by driving around the berms." AR237:000235.

- Road 494R "had a berm or possibly just a water bar that had slumped over time and was not large enough to be effective." AR237:000235.

- Road 7925 "has a berm, but it does not adequately prevent motorcycle or ATV access as a result of illegal altering to the side of the berm." AR237:000236.

- Road 3704F: "The closure device was a sign indicating the road was closed, however I found that the sign had been removed and illegal motorized access was occurring. The sign presumably had been illegally removed." AR237:000236.

- User-created road: "An old skid trail not on the National Forest System road inventory [] was being used for illegal wheeled, motorized vehicle access. The closure device was a sign indicating the route was closed, however I found that the sign had been removed and that illegal access was occurring." AR237:000236.

The Forest Service also recognizes that several gates that should have been locked were open for unknown reasons. AR237:000236. The Forest Service further recognizes that several other trails, which have berms but are not listed as roads in the Forest Service database, are still available to motorized use such as motorcycles, and it took no action regarding those motorized trails. AR237:000236 ("All-Terrain Vehicles or motorcycles could possibly jump the ditch . . . ." ); AR237:000237 ("[a] skilled motorcycle rider may be able to ride over or around one or more of the berms . . . .")

The Forest Service acknowledges that breaches of road closures are not addressed in the Access Amendment standards. AR279:000211. Alliance was also unable to find any reference to this problem and its effects on grizzly bears in the

2011 Access Amendment Biological Opinion and Incidental Take Statement.

However, since systematic monitoring of at least some closures has been required

and conducted since 2012, the agencies now have multiple years of data indicating

that road closure violations are a recurring and pervasive problem throughout the

Recovery Zone, and outside the Recovery Zone. Therefore, the monitoring results

since 2012, in addition to Alliance's investigation, constitute "new information

[that] reveals effects of the action that may affect listed species . . . in a manner or to

an extent not previously considered. . . ." 50 C.F.R. §402.16(b). Reinitiation of

consultation is therefore required. *Id.*

The data on the recurring and pervasive failures of road closures in Cabinet-

Yaak grizzly habitat constitute "new information [] that is critical to the evaluation"

of the true impacts of the Access Amendment. *See Cottonwood*, 789 F.3d at 1087-

88. The management strategy of the Access Amendment is to reduce both open and

total roads to certain specific levels with closure devices. However, if these closure

devices are repeatedly failing, then open and total roads are not in fact being

reduced to the promised levels. Even if individual violations are discovered and

fixed, it appears that as soon as one violation is fixed, another violation pops up like

a game of whack-a-mole. The Ninth Circuit holds that both "the discovery of new

facts," as well as "actions [that] differ from the BiOp assumptions" trigger

reinitiation of consultation. *Gifford Pinchot Task Force*, 378 F.3d at 1077; *N.*

*Alaska Envtl. Ctr*, 457 F.3d at 981. Both circumstances apply here because this data is new and it undermines the assumptions in the Biological Opinion that all closure devices would be effective.

Likewise, in *Hoopa Valley Tribe*, subsection (b) was triggered when weather conditions "that were not anticipated at the time the Proposed Action was analyzed in the BiOp . . . resulted in much higher infection rates than the NMFS thought possible." 230 F.Supp.3d at 1130. Similarly here, pervasive road closure breaches "that were not anticipated at the time the Proposed Action was analyzed in the BiOp . . . resulted in much higher" levels of motorized and human access than anticipated. *See id.*

Likewise, in *Pacificans for a Scenic Coast*, subsection (b) was triggered when the agency failed to secure the preservation of a parcel of land because "[t]he loss of this benefit necessarily implies that the project's net effect on listed species and their habitat will be greater than previously thought." 204 F.Supp.3d at 1092. In this case, as discussed above, roads pose the most imminent threat to grizzly bear habitat, and displacement from both open and closed roads can have significant negative impacts on grizzly bears that may last for generations. Exhibit 1 at 21, 145-147. The Access Amendment open and total road density limits are set at specific, objective thresholds based on scientific studies of grizzly bear tolerance. The foundational premise of the Access Amendment is that, over time, closing roads

with gates will reduce open road density to a scientifically-based appropriate level, and putting a dirt berm in front of roads will reduce total road density to a scientifically-based appropriate level. However, if the closed roads and "nonexistent" roads that the Forest Service has carefully calculated for removal are in fact still receiving motorized use, that means that the scientifically-based road densities are not being met, which means that the negative effects on grizzly bears will be higher than assumed in the Biological Opinion and Incidental Take Statement. In other words, "[t]he loss of this benefit [of compliance with objective, numeric thresholds] necessarily implies that the project's net effect on listed species and their habitat will be greater than previously thought." *Pacificans for a Scenic Coast*, 204 F.Supp.3d at 1092.

Although the Forest Service appears to concede that the effects of road closure breaches on grizzly bears are not addressed in the Access Amendment Biological Opinion and Incidental Take Statement, nonetheless the Forest Service argues that the omission does not require reinitiation of consultation. Two months after this Court denied the agencies' motion to dismiss this claim, *see* Doc. 23, on February 25, 2019, the Forest Service sent a letter to FWS that speculates that the effects to grizzly bears from road closure breaches would be the same as the effects to grizzly bears from temporary roads. AR279:000211-212. In a March 7, 2019 response letter to the Forest Service, FWS simply states: "Upon review of the information

provided, as well as the relevant annual monitoring reports, it is our opinion that none of the criteria for re-initiation of consultation under the Endangered Species Act were triggered." AR280:000213. There is no explanation provided for this legal position. *Id.*

Contrary to the Forest Service's speculation, the effects on grizzly bears from legal temporary roads will not be the same as the effects on grizzly bears from illegal motorized use on roads that are required to be either closed or nonexistent. The Access Amendment Biological Opinion/Incidental Take Statement mandates that temporary roads are closed to public use from September 1 to June 15 each year, i.e. closed to public use for 9.5 months out of the year. AR284:001570. Thus, the Access Amendment Biological Opinion/Incidental Take Statement analysis of how temporary roads will impact grizzly bears is based upon this significant limitation – the public is only permitted to use temporary roads from June 16 to August 31 each year, which is approximately 2 ½ months. AR284:001570. The rest of the year temporary roads are off-limits to public use. AR284:001570. In contrast, illegal public motorized use may occur at any time – it is not limited to 2 ½ months per year, but instead may occur throughout the entire year, including the autumn season (September 1 - November 30) when grizzly bear mortalities are most likely. *See, e.g.,* AR302:004054. Thus, the Forest Service's litigation position is implausible.

### 3. Reinitiation of consultation is required under subsection (c) because the action has been modified in a manner that causes an effect to the listed species that was not considered in the biological opinion.

Finally, "[r]einitiation of formal consultation is required and shall be requested by the Federal agency or by the Service . . . . If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion . . . ." 50 C.F.R. §402.16(c). The Ninth Circuit holds that subsection (c) is triggered if "mitigation measures are not carried out" or there is a "failure of promised conservation measures . . . ." *Ctr. for Biological Diversity*, 698 F.3d at 1114-15 (citations omitted). In such a case, "any risk to listed species thereby created must be borne by the project, not by the endangered species." *Id.*

Here, as discussed above, the foundation of the Access Amendment is the premise that road closures will be effective. In effect, this is the primary "promised conservation measure[]" in the Access Amendment. See *Ctr. for Biological Diversity*, 698 F.3d at 1114-15. Nonetheless, as discussed above at length, both Forest Service monitoring reports and Alliance's independent investigation confirm the reality of recurring and pervasive failures of road closure devices throughout grizzly bear habitat. The "failure of [this] promised conservation measure[]" means that the Access Amendment has been "modified in a manner that causes an effect to the listed species. . .that was not considered in the biological opinion . . . ." *Ctr.*

*for Biological Diversity*, 698 F.3d at 1114-15. 50 C.F.R. §402.16(c). Therefore, reinitiation of consultation is required. *Id.*

Significantly, the fact that the Forest Service may act to remedy individual closure failures when it is aware of those failures does not resolve this problem because the failures and their effects are a recurring and pervasive problem. Indeed, in some areas, users will repeatedly breach the same closure year after year. *See, e.g.,* AR42:000059-62 (noting that boulders placed in 2015 have been removed and unauthorized users are again circumventing gate on Road 2236). Additionally, the Forest Service make take years to act on known violations. *See, e.g.,* AR42:000061 ("The Clatter Creek gate (268) was included on the 2015 gate repair contract but after the bids came in the Clatter Creek gate was dropped due to repair costs for all gate repairs exceeding available funding. In BY2016 the gate remained damaged and ineffective.") Furthermore, the agency may never discover the closure failures in the first place because there is no monitoring requirement to monitor all closure devices every year. Thus, the fact that closure failures are a recurring and pervasive problem, and the fact that the Forest Service may not remedy these failures in a timely manner or at all in some cases, must be addressed in the Access Amendment Biological Opinion.

**4. Any doubt pertaining to any one of these arguments must be resolved in favor of the grizzly bear, not the agencies.**

As noted above, the Supreme Court holds that the preservation of endangered species like the Cabinet-Yaak grizzly takes "priority over the 'primary missions' of federal agencies." *Tennessee Valley Authority*, 437 U.S. at 187. This means that the survival and recovery of the Cabinet-Yaak grizzly bear take priority over road-building and logging, and take priority over a desire to maintain the status quo management regime. Moreover, when making management decisions that affect endangered species, the government and courts must act with "institutionalized caution" regarding these species. *Cottonwood*, 789 F.3d at 1091. This means that the "the benefit of the doubt [must go] to the species." *Connor*, 848 F.2d at 1454.

Accordingly, if there are any doubts in this case whether reinitiation of consultation on the Access Amendment should occur, those doubts must be resolved in favor of the grizzly bear. *Id*. As this Court has previously held, a "tie in the evidence should go to the species . . . ." *Rock Creek All.*, 390 F.Supp.2d at 1008.

**C. The agencies must reinitiate ESA consultation on the Pilgrim Project.**

The Pilgrim Project Biological Assessment represents that during Project activities, the Total Motorized Routes in the Clark Fork Zone would increase by 4.7 miles, from 256.0 miles to 260.7 miles. AR12:000900 Table 3. This increase of 4.7 miles is from "4.7 miles of new permanent road . . . ." AR12:000895. Despite the

fact that there would be 4.7 miles of new permanent roads, the Forest Service states that after Project activities, the Total Motorized Routes in the Clark Fork Zone would revert back to 256.0 miles. AR12:000900 Table 3. This conclusion is based upon the Forest Service's representation that "[u]pon completion of project-related activities all of the previously restricted and new roads used for the project will be closed with a permanent closure device (earth berm, rocks, reclamation) and closure order." AR12:000901.

In response to Alliance's investigation that demonstrated a number of ineffective closure devices, the Forest Service asserts that it has improved a number of closures in the Clark Fork Zone. AR4:000209. However, regarding Road 14622, the Forest Service does not dispute that the berm was removed and will not be replaced. AR4:000209. Instead a gate will be installed, which will have the effect of permanently adding 0.35 miles of total road to the calculation for the Clark Fork Zone. AR4:000209.

Therefore, according to the calculations in the Pilgrim Project Biological Assessment, the permanent removal of the berm on Road 14622 would increase the post-Project condition from 256.0 miles to 256.4 miles. AR12:000900 Table 3. The Access Amendment baseline is 256.1 miles. AR284:001571. This means that the removal of the berm, which was discovered by Alliance's investigators, does in fact lead to total miles of roads that exceed the Access Amendment baseline.

AR284:001571.

As noted above, the Access Amendment baseline is the surrogate for permitted incidental take. AR284:001662. The ESA consultation for the Pilgrim Project tiers to, and is dependent upon, compliance with the Access Amendment Incidental Take Statement. AR12:000930. By exceeding the Access Amendment baseline, the Forest Service is exceeding the permitted incidental take under the Access Amendment. Therefore, the Forest Service cannot rely on the Access Amendment Incidental Take Statement for the Pilgrim Project. *See Bradford*, 720 F.Supp.2d at 1209-10. Accordingly, because the permitted incidental take has been exceeded, the Forest Service must either reinitiate ESA consultation on the Pilgrim Project to receive a valid Incidental Take Statement for the Project, or it must reinitiate ESA consultation on the Access Amendment itself. 50 C.F.R. §402.16(a).[5]

Alternatively, or in addition, reinitiation of ESA consultation on the Project is required under 50 C.F.R. §402.16 (b) or (c). The original ESA consultation for the Project assumed that "[t]he proposed project would be in compliance with the standards provided in the Access Amendment," and therefore assumed that the Project "would not impose additional adverse effects to what was previously analyzed in the 2011 biological opinion." AR12:000930. However, at that time, the

---

[5]Alliance notes that in the FWS March 7, 2019 letter, FWS completely ignores the permanent removal of the berm on Road 14622. AR280:000213.

agencies were unaware that the berm on Road 14622 had been permanently removed.  *See* AR12:000892-932.  The fact that this berm was permanently removed, and will increase the post-Project condition from 256.0 miles to 256.4 miles of total roads,  AR12:000900 Table 3, is therefore either "new information" or a modification of the action.  As a result, there will now be effects that were not considered in the 2011 Access Amendment Biological Opinion because the Access Amendment Biological Opinion analyzed the effects of a baseline of 256.1 miles, AR284:001571, but that baseline will now be exceeded post-Project.   Thus, Alliance's investigation has provided new information that requires reinitiation of consultation for the Pilgrim Project under 50 C.F.R. §402.16 (b) or (c).

## D.  The Forest Service must prepare a supplemental EIS for the Pilgrim Project.

NEPA "is our basic national charter for protection of the environment." *California v. U.S. Dept. of Agriculture*, 575 F.3d 999, 1012 (9th Cir. 2009) (citations omitted).  The twin aims of NEPA are to foster informed public participation and to foster informed decision-making.  *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).  Accordingly, NEPA requires that agencies take a "hard look" at the environmental consequences of their proposed actions before choosing a particular course of action.  *Block*, 690 F.2d at 761.  In order to take this "hard look," NEPA directs federal agencies to prepare an EIS. 42 U.S.C. §4332(2)(C).

"By focusing agency and public attention on the environmental effects of proposed agency action, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 560 (9th Cir. 2006)(citation omitted).

The NEPA implementing regulations state:

> Agencies:
>
> (1) Shall prepare supplements to either draft or final environmental impact statements if:
> . . .
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. §1502.9(c).

Under NEPA's implementing regulations, an impact on a threatened or endangered species is a factor that indicates potential significance. 40 C.F.R. §1508.27. Accordingly, an analysis that fails to take a hard look at the impacts on a threatened or endangered species violates NEPA. *See, e.g., Alaska Wilderness League v. Kempthorne*, 548 F.3d 815, 828 (9th Cir. 2008), *vacated as moot*, 559 F.3d 916 (9th Cir. 2009)(original case holding "we conclude that the agency failed to take a 'hard look' under NEPA because it did not provide a well-reasoned analysis of site-specific impacts to the endangered bowhead whale population").

In *Boody*, the Ninth Circuit held that changes in the way the federal agency was implementing a management plan changed the impact on certain wildlife species and thus required supplemental NEPA analysis. 468 F.3d at 561, 556. The court found that "[i]f [the agency] can modify the protection afforded a species under a resource management plan as dramatically as it has here . . . [the agency] could ultimately remove all the [species protections] without ever conducting another EA or EIS, and without providing public disclosure." *Id*. at 558. The Ninth Circuit found such a result impermissible.

Likewise, in *Native Ecosystems Council v. Tidwell*, the Ninth Circuit found that the Forest Service needed to supplement a NEPA analysis due to new information about impacts on a sensitive wildlife species. The Ninth Circuit noted that the original analysis was "predicated on the assumption that no nesting habitat existed in the project area." 599 F.3d 926, 937 (9th Cir. 2010). New information undermined that assumption, thus the court found a supplemental analysis necessary to address the impact of grazing on that habitat. *Id.*

In this case, just as in *Boody* and *Tidwell*, new information and changed circumstances indicate that actual effects on a sensitive wildlife species may differ from the impacts analyzed in the original NEPA analysis. *See Boody*, 468 F.3d at 556, 558, 561; *Tidwell*, 599 F.3d at 937. The Pilgrim Project EIS contains a cursory six page analysis on the effects of the Project on grizzly bears. *See*

AR12:000811; AR11:000343,454-461. The Pilgrim Project EIS assumes that all road closures will be effective: "Post-project road management status will return to the baseline conditions. Previously restricted (gated roads) will remain gated and new roads constructed for the project will be made impassable to motorized vehicles." AR11:000460.

At the time the Pilgrim Project EIS was issued in 2013, the Forest Service did not have seven years of monitoring reports documenting the ineffectiveness of gates and barriers, nor did the agency have Alliance's independent investigation of road closure failures in the Clark Fork Zone. However, this data is now available , and as discussed at length above, it indicates that road closure failures in the Clark Fork Zone and throughout Cabinet-Yaak grizzly habitat are a recurring and pervasive problem. A supplemental EIS must be prepared if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §1502.9(c). The new information on road closure failures is "significant" because it impacts an endangered species, 40 C.F.R. §1508.27, and indicates that road closure failures are "reasonably foreseeable future actions" that may occur in the Project area. *See* 40 C.F.R. §1508.7.

This information is also "relevant to environmental concerns" because roads pose the most imminent threat to grizzly habitat and may have long-lasting

generational negative impacts on grizzly bears.  Exhibit 1 at 146.  This is a significant concern in this case because, as discussed above, the Cabinet-Yaak grizzly population is extremely small, failing recovery goals, experiencing very high mortality rates, and currently "in danger of extinction" and therefore warranted for uplisting from "threatened" to "endangered" status.

Finally, this information has a "bearing on the proposed action or its impacts" because the Project EIS assumes that all road closures will be effective, and that therefore the Project will comply with the road density standards from the Access Amendment.  AR11:000460; AR12:000811.  However, if reasonably foreseeable road closure failures occur in this Project area, the grizzly habitat in this area would not comply with the Access Amendment.  Thus, this information may change the analysis of the proposed action or its impacts.

For these reasons, under 40 C.F.R. §1502.9(c), a supplemental EIS must be prepared for this Project in order to take a hard look at how grizzly bears may be affected by the pervasive, recurring, and reasonably foreseeable problem of road closure failures.   *Boody*, 468 F.3d at 556, 558, 561; *Tidwell*, 599 F.3d at 937.

## V.  CONCLUSION

For all of the reasons discussed above, Alliance respectfully requests that the Court order the agencies to reinitiate ESA consultation on the Access Amendment to acknowledge the recurring problem of road closure violations and address the

effects of this problem on the Cabinet-Yaak grizzly population. Alliance also requests that the Court order the agencies to reinitiate project-level ESA consultation and prepare a supplemental EIS for the Pilgrim Project to address this problem.

Respectfully submitted this 23rd Day of May, 2019.

/s/ Rebecca K. Smith
Rebecca K. Smith
Public Interest Defense Center, P.C.

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiff

CERTIFICATE OF COMPLIANCE

Pursuant to the Case Management Order in this matter, *see* Doc. 30 adopting Doc. 29, the foregoing brief contains 9,940 words, which is within the 10,000 word limit. In accordance with Local Rule 7.1, a table of contents, table of authorities, and index of exhibits are included in this brief.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
Public Interest Defense Center, P.C.

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiff