Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, P.C.
P.O. Box 7584
Missoula, MT 59807
406.531.8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
406-721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES<br><br>    Plaintiff,<br><br>vs.<br><br>CHERYL PROBERT, et al.,<br><br>    Defendants. | CV-18--67-DWM<br>PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT & REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INDEX OF ADMINISTRATIVE RECORD CITATIONS. . . . . . . . . . . . . . . . . . v

I. RESPONSE & REPLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  The Access Amendment baselines are found in Table 16 of the 2011
        Access Amendment ROD and Table 4 of the 2011 Access Amendment
        Biological Opinion; these baseline conditions are still in effect because
        they have not been lawfully changed. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  The recurring condition above baseline in the majority of the BORZ areas
        requires reinitiation of consultation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.  Unreported illegal road use is also likely increasing roads above the
        baseline, thereby triggering reinitiation of consultation. . . . . . . . . . . . . . 7

    D.  Chronic recurring road closure breaches cannot reasonably be construed as
        "temporary;" and illegal road use does not fall within the scope of Access
        Amendment "temporary" roads. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    E.  The agencies' attempt to minimize the importance of the BORZ areas does
        not bode well for the recovery of the Cabinet-Yaak grizzly bear
        population. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    F.  Alliance's ESA Section 7 consultation claim requests reconsultation on the
        Access Amendment as a whole in order to address the effect of recurring
        illegal road use on this population of endangered grizzly bears . . . . . . 17

    G.  The Pilgrim Project ESA consultation documents indicate that the Clark
        Fork BORZ area exceeds the Access Amendment baseline. . . . . . . . . . 23

H.  The agencies' argument that FWS cannot be sued for reinitiation of ESA consultation has been rejected numerous times. . . . . . . . . . . . . . . . . . . . 25

I.  A supplemental EIS is required for the Project because it is not clear that the Clark Fork BORZ area is complying with the baseline, and the EIS undisputedly never addressed illegal road use. . . . . . . . . . . . . . . . . . . . 26

II. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

TABLE OF AUTHORITIES

CASES

*All. for the Wild Rockies v. Savage,* 897 F.3d 1025 (9th Cir. 2018) . . . . . . . . 10, 11

*Cardozo, J., in Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214
    (1917) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy,*

    305 F.3d 943 (9th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt,*

    698 F.3d 1101 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gifford Pinchot Task Force v. FWS,* 378 F.3d 1059 (9th Cir. 2004) . . . 3, 24, 25, 26

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.,*

    230 F.Supp.3d 1106 (N.D. Cal. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Kisor v. Wilkie,* - - - S. Ct. - - - -, 2019 WL 2605554 (2019) . . . . . . . . . . . . . 15, 17

*Klamath-Siskiyou Wildlands Ctr. v. MacWhorter,* 797 F.3d 645 (9th Cir. 2015) . 20

*Native Ecosystems Council v. USFS,* 418 F.3d 953 (9th Cir. 2005) . . . . . . . . 25, 27

*Salmon Spawning & Recovery All. v. Gutierrez,* 545 F.3d 1220 (9th Cir. 2008). . 26

*Scharff v. Bank of Hawaii,* 432 F.2d 160 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . 23

*Wild Fish Conservancy v. EPA,*

    331 F.Supp.3d 1210, 1226-27 (W.D. Wash. 2018). . . . . . . . . . . . . . . . . . . . . 26

REGULATIONS

36 C.F.R. §219.13(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

36 C.F.R. §219.13(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

50 C.F.R. §402.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19, 24, 26

# INDEX OF EXHIBITS

EXHIBIT 1        1993 USFWS Grizzly Bear Recovery Plan (Excerpts)

EXHIBIT 2        Schwartz et al. 2010. Hazards Affecting Grizzly Bear Survival
                 in the Greater Yellowstone Ecosystem. Journal of Wildlife
                 Management 74(4):654-667.

EXHIBIT 3        Kendall et al. 2016. Density, Distribution, and Genetic
                 Structure of Grizzly Bears in the Cabinet-Yaak Ecosystem.
                 Journal of Wildlife Management 80(2):314-331.

EXHIBIT 4        USFWS Cabinet-Yaak and Selkirk Mountains Grizzly Bear
                 Monitoring Update (November 8, 2018)

EXHIBIT 5        USFWS 1995 Incidental Take Statement for the Kootenai
                 National Forest 1987 Forest Plan

EXHIBIT 6        USFS 2018 Closure Monitoring Report for Cabinet-Yaak &
                 Selkirk Recovery Zones

# INDEX OF ADMINISTRATIVE RECORD CITATIONS

AR 4      Forest Service Post-Litigation Memo Regarding Clark Fork Zone Closure
          Violations (February 14, 2019)

AR 8      Amended Record of Decision - Pilgrim Project (July 1, 2014)

AR 11     Draft EIS - Pilgrim Creek Project (Chapter 3)

AR 12     Final EIS - Pilgrim Creek Project (Chapter 4 & Appendices, Including
          Biological Assessment and Letter of Concurrence)

AR 14     Record of Decision - Pilgrim Project (May 1, 2013)

AR 41     Record of Decision - Kootenai Revised Forest Plan (January 5, 2015)

AR 42     Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones, 2016 Annual Access
          Amendment Monitoring Summary Report, Kootenai, Lolo and Idaho
          Panhandle National Forests (April 14, 2017)

AR 43     Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones, 2017 Annual Access
          Amendment Monitoring Summary Report, Kootenai, Lolo and Idaho
          Panhandle National Forests (July 18, 2018)

AR 237    Forest Service Post-Litigation Memo Regarding Tobacco Zone Closure
          Violations (February 19, 2019)

AR 279    Forest Service Post-Litigation Letter to USFWS Regarding Clark Fork
          and Tobacco Zone Closure Violations (February 25, 2019)

AR280     USFWS Post-Litigation Letter to Forest Service Regarding Clark Fork
          and Tobacco Zone Closure Violations (March 7, 2019)

AR 282    Final Supplemental EIS - Access Amendment (November 1, 2011)

AR 283    Final Record of Decision - Access Amendment (November 1, 2011)

AR 284    Biological Opinion & Incidental Take Statement - Access Amendment
          (October 18, 2011)

AR 302    USFWS Cabinet-Yaak Grizzly Bear Recovery Area 2017 Research and
          Monitoring Progress Report (2018)

AR 303    Wancour Declaration Regarding Independent Investigation of Road
          Closure Violations in Clark Fork and Tobacco Zone (May 9, 2018)

AR 404    Photograph #2704 - Cited in Wancour Declaration Regarding
          Independent Investigation of Road Closure Violations in Clark Fork and
          Tobacco Zone (May 9, 2018)

**A.  The Access Amendment baselines are found in Table 16 of the 2011 Access Amendment ROD and Table 4 of the 2011 Access Amendment Biological Opinion; these baseline conditions are still in effect because they have not been lawfully changed.**

In a footnote, the agencies state: "Since 2010, baseline conditions have been periodically updated to reflect corrections in the Infrastructure database."  Doc. 41 at 19 n.10.   The agencies then apply these altered "baseline conditions" throughout their briefing.  However, the agencies make no attempt to explain why they believe they can change the Access Amendment baselines by fiat.  The Access Amendment ROD states:  "The Forest shall ensure no net permanent increases in linear miles of total roads in any individual BORZ area above *the baseline conditions identified in Table 16 . . . .*"  AR283:001847 (emphasis added).

NFMA regulations dictate that only a forest plan amendment can lawfully change the text of a forest plan: "a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan components apply to all or part of the plan area (including management areas or geographic areas)." 36 C.F.R. §219.13(a).  The NFMA regulations also require a NEPA process for a forest plan amendment: "The appropriate NEPA documentation for an amendment may be an environmental impact statement, an environmental

assessment, or a categorical exclusion, depending upon the scope and scale of the amendment and its likely effects." 36 C.F.R §219.13(b)(3). The Access Amendment has never been amended to change the Table 16 baseline conditions. Thus, the Table 16 baseline conditions are still in effect.

Similarly, the Access Amendment Incidental Take Statement states: "[i]n the BORZ, permanent increases in linear miles of open road and/or permanent increases in linear miles of total road *beyond the standards in Table 4 of this biological opinion* will result in levels of take that exceed the amount of incidental take we anticipate here, and reinitiation of consultation would be required." AR284:001662 (emphasis added). The Ninth Circuit holds that baseline conditions in a biological opinion cannot be updated or amended without additional ESA consultation:

> The Appellants' final challenge is to the FWS's "amendments" to the BiOps, which include the range-wide "baseline report," three province-wide "baseline updates," and a "baseline update" for the Gifford Pinchot National Forest. As a general rule, such "updates" are prohibited because they would render the consultation process "meaningless" . . . . As we have recognized, the discovery of new facts does not justify an "amendment" to the BiOp, but mandates reinitiating formal consultations.
> . . .
> We reject the FWS's argument. If the data is new and the new data may affect the jeopardy or critical habitat analysis, then the FWS was obligated to reinitiate consultation pursuant to 50 C.F.R. §402.16. If the data was preexisting, then the FWS is to be faulted for not generating the information in time for the initial BiOp.

*Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1076-77 (9th Cir.),

*amended*, 387 F.3d 968 (9th Cir. 2004), *superceded by regulation on other*

*grounds.*

Because the agencies have not followed the procedures required by law to

change the baseline conditions in Table 16 of the ROD and/or Table 4 of the

Biological Opinion, those Tables control and set forth the legally-required baseline

conditions.  The Tables are both set forth below:

Table 16. Habitat conditions for bears outside recovery zone (BORZ) occupancy areas

| BORZ Name | Grizzly Bear Ecosystem | Total Size (Acres) | NFS[1] Lands (Acres) | Total Linear Miles of Roads on NFS Lands | Total Linear Miles of Open Roads on NFS Lands |
|---|---|---|---|---|---|
| Priest | Selkirk | 80,733 | 75,793 | 316.4 | 314.4 |
| Pack River | Selkirk | 33,869 | 28,097 | 41.9 | 37.9 |
| Mission-Moyie | Cabinet-Yaak | 71,545 | 58,472 | 200.3 | 167.3 |
| Clark Fork | Cabinet-Yaak | 101,899 | 100,421 | 256.1 | 176.9 |
| Cabinet Face | Cabinet-Yaak | 28,052 | 27,093 | 164.1 | 128 |
| West Kootenai | Cabinet-Yaak | 173,122 | 169,705 | 615.3 | 315.9 |
| Tobacco | Cabinet-Yaak | 287,240 | 266,947 | 1,123.9 | 867 |

[1] National Forest System lands

AR283:001848.

**Table 4.** Existing motorized access conditions for Bears Outside of Recovery Zone (BORZ) areas situated on the Idaho Panhandle and Kootenai National Forests.

| BORZ Name | Grizzly Bear Ecosystem | Total Size (Acres) | NFS[1] Lands (Acres) | Total Linear Miles of Roads on NFS Lands | Total Linear Miles of Open Roads on NFS Lands |
|---|---|---|---|---|---|
| Priest | Selkirk | 80,733 | 75,793 | 316.4 | 314.4 |
| Pack River | Selkirk | 33,869 | 28,097 | 41.9 | 37.9 |
| Mission-Moyie | Cabinet-Yaak | 71,545 | 58,472 | 200.3 | 167.3 |
| Clark Fork | Cabinet-Yaak | 101,701 | 100,223 | 256.1 | 176.9 |
| Cabinet Face | Cabinet-Yaak | 27,140 | 26,177 | 164.1 | 128.0 |
| West Kootenai | Cabinet-Yaak | 173,122 | 169,705 | 615.3 | 315.9 |
| Tobacco | Cabinet-Yaak | 287,240 | 266,947 | 1,123.9 | 867.0 |

[1]National Forest System Lands

AR284:001571.

## B.  The recurring condition above baseline in the majority of the BORZ areas requires reinitiation of consultation.

Assuming for the sake of argument that the Forest Service's current condition estimates in its monitoring reports are accurate, those reported current conditions still violate the legally-required baseline in four out of seven BORZ areas: Priest Lake, Cabinet Face, West Kootenai, and Mission-Moyie.  Exhibit 6 at 11 (2018 Monitoring Report[1]); AR43:000081 (2017 Monitoring Report),  AR284:001571 (Access Amendment baseline).  In response, the agencies argue that some road density increases are temporary, but they also inexplicably ignore others, such as the

---

[1]The agencies provided this report to Alliance on June 17, 2019.  It is attached as Exhibit 6.

total road and open road conditions in the Mission-Moyie BORZ area, as well as the open roads condition in the West Kootenai BORZ area, which all exceed the baseline as set forth in the table below. Doc. 41 at 22-23.

Moreover, even if some individual road increases in the BORZ areas are temporary, the agencies ignore the fact that these BORZ areas are chronically exceeding the baseline, which renders the argument that the individual increases are "temporary" rather hollow. The Access Amendment baseline is set forth below in bold font under the BORZ name, and the current conditions from each Forest Service monitoring report are also set forth. Shaded gray cells are used to indicate when the Forest Service's reported condition exceeded the Access Amendment baseline:

| BORZ Area | Priest Lake Open | Priest Lake Total | Mission Moyie Open | Mission Moyie Total | Cab. Face Open | Cab. Face Total | West Koot. Open | West Koot. Total |
|---|---|---|---|---|---|---|---|---|
| Legal Baseline | **314.4** | **316.4** | **167.3** | **200.3** | **128.0** | **164.1** | **315.9** | **615.3** |
| 2011 | 314.4 | 316.4 | 167.3 | 200.3 | 130.0 | 164.1 | 323.7 | 607.9 |
| 2012 | 317.0 | 319.0 | 167.3 | 200.3 | 129.5 | 164.6 | 341.6 | 654.4 |
| 2013 | 317.0 | 319.0 | 167.3 | 200.3 | 129.5 | 164.6 | 342.3 | 641.9 |
| 2014 | 317.0 | 319.0 | 167.3 | 200.3 | 129.5 | 164.6 | 342.3 | 641.2 |
| 2015 | 317.2 | 319.2 | 167.3 | 200.3 | 130.0 | 165.0 | 342.3 | 641.2 |

| 2016 | 317.2 | 325.7 | 240.0 | 272.0 | 130.5 | 165.0 | 340.4 | 638.1 |
| 2017 | 317.2 | 319.2 | 236.7 | 268.7 | 138.0 | 166.5 | 353.5 | 671.9 |
| 2018 | 317.2 | 319.2 | 239.7 | 271.7 | 140.8 | 169.8 | 360.6 | 639.7 |

*See* AR Documents 281, 7, 30, 31, 32, 42, 43; Exhibit 6 at 11.

Thus, the Priest Lake, Cabinet Face, and West Kootenai BORZ areas have exceeded the open and total road baselines from 2012 to the present, and the Mission-Moyie BORZ area has exceeded the open and total road baselines from 2016 to the present. This chronic failure to comply with the baseline cannot reasonably be construed as "temporary." Thus, the *de facto* permanent increases above baseline in these areas exceeds permitted incidental take and thereby triggers reinitiation of ESA consultation. AR284:001662.

Furthermore, the agencies argue that the Access Amendment has not been modified in a manner that causes a new effect on grizzly bears because "conservation measures in the biological opinion are being fulfilled" because "[t]he reports show that, for the majority of the seven BORZ, open and total road mileage has been at or below baseline conditions since reporting began in 2011." Doc. 41 at 30-31. The fatal flaw in this argument is that, as set forth above in Section A, the agencies are not comparing existing conditions to the actual Access Amendment baseline. Thus, as set forth in the table above, when the actual Access Amendment

baselines are disclosed, at least four out of seven – i.e. the majority – of the BORZ areas are not in fact complying with the required conservation measures from the 2011 Biological Opinion. "[W]here an action agency does not reinitiate consultation with the FWS despite the failure of promised conservation measures, the Biological Opinion for the proposed action becomes invalid." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt*, 698 F.3d 1101, 1114-15 (9th Cir. 2012).

**C. Unreported illegal road use is also likely increasing roads above the baseline, thereby triggering reinitiation of consultation.**

In the agencies' discussion of the Clark Fork and Tobacco BORZ areas, the agencies presume that the road calculations reported in the annual monitoring reports are correct. Doc. 41 at 21-22. However, in its independent investigation of the Tobacco and Clark Fork BORZ areas, Alliance found ineffective berms, ineffective gates, and illegal roads on the landscape with no barrier device at all. AR303:0004127-4129, 4131-4134. In response to Alliance's investigation, the Forest Service now concedes that at least one road in the Clark Fork BORZ area had "an ineffective closure device" and five other roads had "opportunities for improvement." AR4:000208.

Furthermore, during this litigation, the Forest Service issued an internal memo

that discloses that it discovered additional closure violations in the Clark Fork

BORZ area in June 2018: "One road was found to have possible evidence of ATV

use around the barrier. Three other roads had gaps alongside the gate that a

motorcycle could get around, and in one case possibly an ATV . . . ."

AR232:000767. Apparently, the agency did not fix those closures in June 2018, but

instead plans to fix them in the summer of 2019: "All four roads will be evaluated

and improved as necessary when conditions allow next summer." AR232:000767.

Crucially, the Forest Service does not disclose the road mileage behind these

ineffective closures in its internal memo; therefore it is unclear how many miles of

additional open and total roads must be added to the existing condition calculations

for 2018 and 2019 as a result of these ineffective closures. Moreover, the Forest

Service does not disclose these four breaches in the 2018 monitoring report,

although it found them in 2018, Exhibit 6 at 12, and it fails to disclose them to this

Court in its briefing in this case.

According to the Pilgrim Project Biological Assessment, the post-Project

condition for total miles in the Clark Fork BORZ area will be 256.1 miles.

AR2:002686. In briefing, the Forest Service offers a different estimate for total

miles of roads in the Clark Fork BORZ area from the 2017 monitoring report –

250.3 miles. Doc. 41 at 21. Thus, the addition of 0.4 miles from the permanently-

removed berm discovered by Alliance's investigation results in either 256.5 miles or 250.7 miles. *See* AR4:000209. The baseline is 256.1 miles. AR283:001848. Accordingly, if the collective mileage behind the four ineffective barriers discovered in 2018 was 5.5 miles or greater, the baseline would be exceeded under either calculation.

Similarly, in the Tobacco BORZ area, the Forest Service now concedes that "[o]f the eight road closures that did not effectively prevent motorized access at the time that [the agency] inspected them, three berms were found to be ineffective because of illegal removal of the berm or rock barriers or the berm was not initially constructed large enough, three gates were found to be open, and two routes were closed using signage. . . .This signage was illegally removed at the time of my inspection." AR237:000235. Thus, as a result of Alliance's investigation, the Forest Service now acknowledges that at least 8.1 miles of roads were unlawfully open in the Tobacco Zone area, which caused the area to exceed the Access Amendment baseline. AR237:000237.

The Forest Service implies that it had no knowledge of these ineffective barriers prior to Alliance's investigation and lawsuit. This undermines any presumption that the annual monitoring reports are portraying accurate current conditions.

In addition to its apparent lack of knowledge of these closure failures, the

Forest Service also claims to have no knowledge of the illegal, user-created roads

on the landscape. Doc. 43 at 49-50. Alliance's investigation found "numerous

roads that were not on the Forest Service map and were not closed or obstructed in

any way to prevent motorized access." AR303:004140. In a recent Ninth Circuit

Opinion, the court found that the Forest Service had failed to establish whether

similar "undetermined" roads of unknown origin caused an increase above the

Tobacco BORZ baseline:

> the error cannot be treated as harmless in light of the ambiguity in the
> record as to whether the "undetermined" roads at issue were, in fact,
> included in the Access Amendments baseline calculation. [FN18]

> [FN 18] Although a non-exhaustive list, we highlight three problems
> with the evidence to illuminate the ambiguity in the record. First,
> because "undetermined" is a sub-category of "unauthorized" roads, it
> is possible that the particular undetermined roads at issue in this case
> were created—without authorization from the Forest Service—in the
> interim between the measurement of the Access Amendments baseline
> and the Forest Service's survey of existing roads for the Project.

*All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1036, n.18 (9th Cir. 2018).

In light of these circumstances that (1) road closures/barriers are regularly

breached but the Forest Service conducts no systematic monitoring to determine

how many miles of illegal road use are occurring behind barriers each year, and (2)

the Forest Service simply ignores illegal "undetermined" roads and does not include

them in its calculations for open or total roads in the annual monitoring reports, the open and total road numbers in the monitoring reports are not accurately reflecting the conditions on the ground. It is therefore reasonable to assume that the baselines in the Clark Fork and Tobacco BORZ areas are regularly exceeded because the reported conditions hover at or near the baseline.

**D. Chronic recurring road closure breaches cannot reasonably be construed as "temporary;" and illegal road use does not fall within the scope of Access Amendment "temporary" roads.**

The agencies acknowledge that road closure breaches (and resulting illegal road use) are not addressed in the Access Amendment. Doc. 41 at 25. Nonetheless, the agencies argue that all road closure breaches – regardless of whether they are chronically recurring and regardless of how long they last on the landscape – must be construed as "temporary" road increases. *Id.* Onto this premise, the agencies then bootstrap an additional argument that because certain specific types of temporary roads were addressed in the Access Amendment, that discussion must also apply to "temporary" road increases from illegal road use. *Id.*

First, it is not reasonable to construe recurring illegal road use as "temporary" road density increases. The monitoring reports indicate that public users may repeatedly breach the same closure year after year. *See, e.g.*, AR42:000059-62 (noting that boulders placed in 2015 have been removed and unauthorized users are

again circumventing gate on Road 2236). Moreover, the Forest Service may take years to act on known violations. *See, e.g.,* AR42:000061 ("The Clatter Creek gate (268) was included on the 2015 gate repair contract but after the bids came in the Clatter Creek gate was dropped due to repair costs for all gate repairs exceeding available funding. In BY2016 the gate remained damaged and ineffective."); *see also* AR43:000081-82 (note 2)(during planning for the Hanna Flats logging project, the Forest Service found illegal motorized use on 15.7 miles of road that were not included in the baseline but the agency postponed remedial action until implementation of the logging project; in the 2018 monitoring report, the agency concedes it has still not yet eliminated this illegal use); *see also* AR232:000767 (finding that four barriers did not effectively prevent motorized use but deferring any action to fix the problems).

Thus, while the Forest Service insists that all breaches are temporary, those same breaches may be recurring or may have lasted for many years prior to discovery and remedial action, resulting in a chronic situation. The situation with the BORZ is a good illustration of this problem – although the Forest Service insists that it fixes all breaches as soon as possible, nonetheless at least four out of seven BORZ areas chronically fail to meet both the open and total road baseline conditions from the Access Amendment, as shown above in the table in Section B.

Second, even assuming that illegal road use could be construed as "temporary," it still does not have the same effect as lawful temporary road use. A breach of a closure device that results in public motorized use in effect results in an open road. The Access Amendment severely restricts temporary increases in open roads: "immediately following completion of all mechanized harvest and post-harvest slash activities requiring use of the road, to allow motorized public use during the bear summer season prior to the fall bear hunt (i.e., June 16 - August 31) for activities such as personal firewood collection. This public access would only be provided in cases where the mechanized harvest and/or post-harvest slash activities occurred during the same active bear year." AR283:001847.

Thus, temporary increases in open roads are limited to a June 16-August 31 window, and may only occur in the same year in which logging activities have already occurred and used that particular road, presumably because grizzlies would have already been displaced from those areas. AR283:001847. In contrast, illegal motorized use behind road closure breaches is not limited to a June 16-August 31 window, and is not limited to a single year entry on a road along and on which logging activities have already been occurring.

Moreover, illegal road use would also constitute an increase in total roads. However, temporary increases in total roads are only permitted if (1) the roads are

"effectively" gated to prevent public use during a project, (2) after project use, the roads are treated so as to "effectively prevent[] motorized access" and require no motorized access for maintenance for at least 10 years, and (3) upon project completion, the area is "returned to or below the baseline levels contained in Table 16" of the Access Amendment ROD. AR283:001848. Obviously a road that has illegal road use is not "effectively" gated to prevent public use.

Thus, illegal road use does not comply with the restrictions set for lawful increases in temporary roads – neither open nor closed – in the Access Amendment and therefore cannot possibly have the same effects. It is simply implausible that unlimited illegal road use occurring at any time in any location would have the same effect on grizzly bears as Access Amendment temporary roads that are significantly restricted in both timing and location. Indeed, illegal road use is illegal precisely because the Forest Service has already closed these specific roads to protect grizzly bears. If illegal motorized use occurs on these roads that were closed to protect grizzly bears, it may displace grizzly bears from areas that they would otherwise not be displaced from.

Finally, the Supreme Court recently issued a decision that significantly cabins deference to administrative agencies:

First and foremost, a court should not afford *Auer* deference unless the

14

> regulation is genuinely ambiguous. . . . If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law.

*Kisor v. Wilkie*, - - - U.S. - - - - 2019 WL 2605554, at *8 (U.S. June 26, 2019).

Thus, this Court does not owe "substantial deference" to the agencies by default, as they argue. *See* Doc. 41 at 21. Instead, the relevant regulatory, or here Forest Plan, provision must be "genuinely ambiguous." *Kisor*, 2019 WL 2605554, at *8.

The relevant provision in this case does not meet that test: it is clear on its face that a "temporary" road as defined by the Access Amendment must comply with strict timing and geographic limitations. AR283:001847-48. Thus, the agencies' attempt to extrapolate that analysis to illegal road use with no temporal or geographic restrictions at all is entitled to no deference. The Access Amendment consultation simply does not address illegal road use or its effects on grizzly bear; this fact triggers reinitiation of ESA consultation.

**E. The agencies' attempt to minimize the importance of the BORZ areas does not bode well for the recovery of the Cabinet-Yaak grizzly bear population.**

In light of high road densities and recurring failures to comply with the Access Amendment baselines in the BORZ areas, agency counsel attempts to minimize the importance of the BORZ areas:

> the fact that there is no reporting requirement for the BORZ in the

Access Amendments is not an oversight. The Access Amendments provide monitoring requirements for Recovery Zones because *those areas are more important for grizzly bear recovery*. []. BORZ, by contrast, are areas where bears "sometimes" frequent and, as a result, are prescribed less protective management measures than Recovery Zones. [].

Doc. 41 at 23-24 (emphasis added).

The implication here is that bears do not want or need to use the BORZ areas, and therefore they only occasionally use the areas. However, the best available science indicates that the opposite is true: bears do need to use these areas but the road densities are so high, and standards so weak, that they are displaced from these areas on a recurring basis. This is the general finding in Kendall et al. 2016, which is the only peer-reviewed, published scientific journal article that addresses the importance of BORZ areas to the Cabinet Yaak grizzly population. The Kendall study finds that although the Recovery Zone contains the "home range *centers* of almost all grizzlies" in the Cabinet-Yaak population, "nearly 75% of radio-collared bears had home ranges that included areas *outside*" the Recovery Zone. Exhibit 3 at 326 (emphases added). This extension outside the Recovery Zone is necessary because the Recovery Zone "is relatively narrow in relation to the average home range size of grizzly bears." Exhibit 3 at 326.

Because there are weaker protections outside the Recovery Zone, "this

configuration places bears at greater risk of coming into contact with people and intentional or accidental killing by humans." Exhibit 3 at 326-327. Thus, "[a]reas bordering protected areas [such as the BORZ areas bordering the Recovery Zone] *have the greatest influence on population dynamics* in small reserves with high perimeter [to] area ratios and in species that range widely [], characteristics exemplified by the [Cabinet-Yaak Ecosystem] and grizzly bears." Exhibit 3 at 327 (emphasis added). Moreover, "[a]n additional challenge to human-bear conflict prevention is the relatively high density of roads and diversity of human activities in the [Cabinet-Yaak Ecosystem] compared with other recovery zones." *Id*.

Thus, in contrast to agency counsel's unsupported statement that the Recovery Zone is "more important for grizzly bear recovery" than the BORZ areas, Doc. 41 at 23-24, the peer-reviewed, published literature on this issue finds that the BORZ areas "have the greatest influence on population dynamics . . . ." Exhibit 3 at 327. Not surprisingly, the agencies refused to include this study in the administrative record, and have strongly opposed the Court's consideration of this study. *See, e.g.,* Doc. 35 at 13.

**F. Alliance's ESA Section 7 consultation claim requests reconsultation on the Access Amendment as a whole in order to address the effect of recurring illegal road use on this population of endangered grizzly bears**.

The agencies' primary defense to the ESA consultation claim is that all of the

individual road closure violations set forth in the Forest Service's 2016 and 2017 monitoring reports, and discussed in Alliance's summary judgment brief as examples, were not individually listed in Alliance's 60-day notice or complaint. Doc. 41 at 15-18. First, this argument is disingenuous because the agencies already knew about these violations: each year the Forest Service provides FWS with an annual monitoring report that discloses dozens of road closure violations that the Forest Service has found. *See e.g.* AR Documents 281, 7, 30, 31, 32, 42, 43. Thus, Alliance is citing to examples that are already known to both agencies.

Moreover, these annual Forest Service reports are not posted on any website or otherwise routinely provided to the public; instead individual members of the public may only obtain these reports as part of an administrative record in litigation or, if known, requested in a Freedom of Information Act request. Thus, while Alliance was unaware until it received the administrative record that the annual monitoring reports documented dozens of violations, the Forest Service and FWS were aware of this fact, and have been aware of this fact for years.

Second, the Court should reject the agencies' persistent strawman argument that this case is only about certain specific road closure violations and whether those specific road closures effectively prevent motorized access. The agencies represent: "[t]he narrow question before this Court is whether road closures in two BORZ

polygons – Clark Fork and Tobacco – in the Kootenai National Forest are effectively preventing motorized access . . . ." Doc. 41 at 1. This narrow question is not before the Court; to the contrary, this narrow question appears to be a restatement of Alliance's NFMA claim, which this Court has already dismissed as non-justiciable. Doc. 23 at 21.

In contrast, the ESA Section 7 reinitiation of consultation claim presents a much broader question – whether the ongoing problem of recurring road closure failures and illegal road use in endangered grizzly habitat raises the possibility of effects on grizzly bears that were not addressed in the 2011 ESA consultation on the Access Amendment. *See* 50 C.F.R. §402.16; Doc. 38 at 24- 35. The agencies cannot deny that this is an ongoing problem because it is documented in the annual monitoring reports, as discussed above. Additionally, they admit that the Access Amendment never addressed this issue. Doc. 42 ¶21; Doc. 43 ¶91.

Alliance conducted an investigation of two BORZ areas to provide the Court with examples of violations found after just one visit to each closure. Alliance never intended that the results of a single visit to each closure would be set in stone as the only road closure violations that have ever occurred or ever will occur. For this reason, in briefing in this case, Alliance cites not only to its own investigation, which was limited by time and resource constraints, but also to the Forest Service's

annual reports because those reports further substantiate Alliance's primary

complaint in this case – illegal road use is a recurring, chronic problem in the habitat

for the endangered Cabinet-Yaak grizzly bear, and the road management regime for

this habitat has not yet addressed the effects on bears from this significant problem.

This claim is set forth in Alliance's 60-Day Notice:

> Additionally, the agencies must reinitiate ESA consultation on the
> Access Amendments and Pilgrim Project because the original analyses
> presumed no motorized access would occur behind berms and that
> assumption has proven false. Moreover, the investigators discovered
> numerous roads, including roads with no berm whatsoever, that were
> unaccounted for in the Forest Service Road databases of linear miles
> of total roads in the BORZ polygons. Because these roads exist on the
> BORZ landscape with no berm that effectively prohibits motorized
> access, the linear miles of total roads in the BORZ has increased over
> the baseline that is set forth in the Access Amendment. This also
> requires a new Incidental Take Statement under Section 9 and
> reinitiation of consultation under Section 7 for both the Access
> Amendment and the Pilgrim Project.

Doc. 12-1 at 4-5.

Thus, the 60-Day Notice raised the issue of illegal motorized use behind

berms and illegal roads, and requested reinitation of consultation and a new

Incidental Take Statement for the Access Amendment as a whole on these grounds.

Thus, this notice provides sufficient information to the agencies, particularly

"considering the defendant's superior access to information about its own

activities." *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 651

(9th Cir. 2015)(internal punctuation and citations omitted).  As the Ninth Circuit has

held:   "Congress did not intend to unduly burden citizens by requiring them to

basically carry out the job of the agency."  *Cmty. Ass'n for Restoration of the Env't*

*v. Henry Bosma Dairy*, 305 F.3d 943, 951-953 (9th Cir.2002).

Additionally, this claim is also set forth in Alliance's Amended Complaint:

## SECOND CLAIM FOR RELIEF

USFS's failure to ensure compliance with the Access Amendments
baselines requires reinitiation of ESA consultation, and indicates that
USFS is causing unpermitted "take" of the threatened Cabinet-Yaak
grizzly bear in violation of Section 9 of the ESA. The agencies must
reinitiate ESA consultation on the Access Amendments and Pilgrim
Project.
. . .
113.  Because (1) numerous earthen berms fail to effectively prevent
motorized access, (2) numerous roads are open for motorized use
although they are designated as closed, and (3) there are a number of
illegal user-created open roads on the landscape, USFS has allowed an
increase in open and/or total roads above the Access Amendments
baseline, which exceeds the amount of take authorized by the
incidental take statement, thereby triggering the need for reinitiation of
consultation.

114.  Moreover, the discovery of numerous ineffective berms,
ineffective closures, and illegal user-created roads constitutes either
new information and/or a modification of the action, which also
requires reinitiation of consultation.

Doc. 4 at 34-35.

Finally, this claim was raised in the Preliminary Pretrial Statement, and

supplemented with the supporting evidence found in the administrative record:

> the discovery of numerous ineffective berms, ineffective closures, and illegal user-created roads constitutes either new information and/or a modification of the action, which also requires reinitiation of consultation.
> . . .
> in preparation for the hearing on Defendants' motion to dismiss, Plaintiff uncovered further factual evidence in support of this claim. . . . Defendants' own monitoring indicates recurring and chronic violations of road closure barriers.  For example, in 2017 alone, Defendants found 13 closure violations in the BORZ areas, and 20 violations in the Recovery Zone.
> . . .
> Prior Monitoring Reports document similar numbers of violations. For example, the 2016 Monitoring Report documents over 20 violations in the Recovery Zone in 2016 alone, including breached gates and barriers, illegal user created routes, and agency use of barriered roads for fire management activities. []. This report also indicates that violations are not always immediately remedied: . . . .
>
> The 2016 Monitoring Report also demonstrates the fact that it is easy for a determined user to breach the types of barriers routinely installed by the agency; for example, . . . .

Doc. 28 at 10-13.

Accordingly, the agencies are fully aware of the relevant facts and legal

claims in this case.  In rejecting a similar argument in a different case, the Ninth

Circuit held:

> "Although the pleadings did not expressly refer to 'mutual mistake,' such precise formality [FN 4] is not required where, as here, *the pleadings and pretrial statement made all parties fully aware of the underlying claims*.

[FN 4] 'The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal.' Cardozo, J., in *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917).

*Scharff v. Bank of Hawaii*, 432 F.2d 160, 163 (9th Cir. 1970)(emphasis added).

## G. The Pilgrim Project ESA consultation documents indicate that the Clark Fork BORZ area exceeds the Access Amendment baseline.

The agencies' argument regarding the Clark Fork BORZ and Pilgrim Project ESA consultation relies completely on accepting the total road estimate from the 2017 monitoring report (250.3), and rejecting the total road estimate from the Pilgrim Biological Assessment and FWS concurrence (256.1). Doc. 41 at 32-34. In short, the Pilgrim Project Biological Assessment represents that during Project activities, total roads in the Clark Fork BORZ would increase by 4.7 miles, from 256.0 miles to 260.7 miles, and revert back to 256.0 miles post-Project. AR12:000900 Table 3. In an errata to the Biological Assessment, the Forest Service disclosed that post-Project conditions for total roads would be 256.1 miles. AR2:002686. FWS concurred. AR3:002688. The permanent removal of a berm, discovered in Alliance's investigation, results in an addition of 0.4 miles, AR4:000209, which pushes the BORZ above the baseline of 256.1 miles, AR283:001848.

First, it is not clear why the agencies now ignore their own Project-level ESA

consultation analysis, and instead cite different numbers from a different document that was not part of any ESA consultation.  As noted above, even if the numbers from the original consultation have changed or need to be "updated," the only lawful way to do that is with a new ESA consultation:

> The Appellants' final challenge is to the FWS's "amendments" to the BiOps, which include the range-wide "baseline report," three province-wide "baseline updates," and a "baseline update" for the Gifford Pinchot National Forest.  As a general rule, such "updates" are prohibited . . . .
> . . .
> We reject the FWS's argument. If the data is new and the new data may affect the jeopardy or critical habitat analysis, then the FWS was obligated to reinitiate consultation pursuant to 50 C.F.R. §402.16. If the data was preexisting, then the FWS is to be faulted for not generating the information in time for the initial BiOp.

*Gifford Pinchot Task Force*, 378 F.3d at 1076-77.

Second, the Forest Service inexplicably fails to disclose to this Court the fact that it found additional road closure violations in the Clark Fork BORZ area during this litigation.  As noted above, in June 2018, the agency found four additional ineffective road closures but deferred taking any remedial action.  AR232:000767. The Forest Service does not disclose the road mileage behind these ineffective closures, but due to the fact that the Clark Fork BORZ area is already hovering around the baseline number, an increase above baseline cannot be ruled out. Furthermore, as noted above, these four breaches found by the Forest Service in

2018 were not disclosed by the Forest Service in the 2018 monitoring report.  *See*

Exhibit 6 at 12.  The agency's failure to disclose known breaches – and the resulting

increase in road mileage – in its monitoring report raises a red flag regarding that

document's accuracy or lack thereof.

In the very least, the agencies need to present a clear analysis of this issue in

a reconsultation for the Project  *See, e.g., Gifford Pinchot Task Force*, 378 F.3d at

1076–77; *see also Native Ecosystems Council v. USFS*, 418 F.3d 953, 964 (9th Cir.

2005)(remanding due to the "Forest Service's contradictory calculations and the

otherwise opaque nature of the record on the factual basis for the Forest Service's

analysis . . . .")

## H.  The agencies' argument that FWS cannot be sued for reinitiation of ESA consultation has been rejected numerous times.

The agencies argue that FWS cannot be sued for a reinitiation of ESA

consultation claim: "Since the Fish and Wildlife Service does not have a duty to and

cannot itself reinitiate consultation, Plaintiff's ESA cause of action fails to state a

claim against the Fish and Wildlife Service."  Doc. 41 at 34-35.  This argument has

been rejected numerous times.  As recently summarized by the Western District of

Washington:

> The regulation outlining the duty to reinitiate consultation, as
> referenced above, provides "[r]einitiation of formal consultation is

required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law" and one of four triggering events occurs. 50 C.F.R. § 402.16.

Because by its plain language the provision that obligates EPA to reinitiate consultation applies equally to NMFS, and because this question appears to be amply settled in this Circuit, the Court denies Defendants' motion to dismiss Plaintiff's Third Cause of Action on this basis as well. *See Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F.Supp.3d 1106, 1116–17 (N.D. Cal. 2017) ("While the federal agencies' arguments might be compelling if this was an issue of first impression, the Ninth Circuit has already addressed this precise issue multiple times and confirmed that both the action agency and the consulting agency have a duty to reinitiate consultation."), *citing Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008) ("The duty to reinitiate consultation lies with both the action agency and the consulting agency."); *Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1076–77 (9th Cir. 2004) (holding that discovery of new facts "mandates reinitiating formal consultations" and that "[the consulting agency] was obligated to reinitiate consultation"); *EPIC*, 255 F.3d at 1076 ("The duty to reinitiate consultation lies with both the action agency and the consultation agency.")

*Wild Fish Conservancy v. EPA*, 331 F.Supp.3d 1210, 1226-27 (W.D. Wash. 2018).

**I. A supplemental EIS is required for the Project because it is not clear that the Clark Fork BORZ area is complying with the baseline, and the EIS undisputedly never addressed illegal road use.**

Finally, regarding Alliance's supplemental EIS claim for the Pilgrim Project,

the Forest Service argues:

the 2013 EIS and Biological Assessment assumed temporary increases above the baseline and the actual open and total road miles (even with

26

> the missing berm) are still below the baseline established in the Access Amendment. AR768. Because all effects about open and total roads were consistent with the earlier analyses, the new information was not significant within the meaning of NEPA and did not require supplementation of the Project EIS.

Doc. 41 at 40. To the contrary, as discussed above at length, lawful temporary roads cannot reasonably be construed as having the same effects as illegal roads because the former has precise geographic and temporal restrictions and the latter has no restrictions whatsoever. The Project EIS did not acknowledge illegal road use as potential problem. Now that multiple breaches have been documented in the Clark Fork BORZ, this is a known problem that must be addressed in a supplemental EIS. Additionally, as discussed above, it is not at all clear that open and total road miles are below the baseline due to the "Forest Service's contradictory calculations and the otherwise opaque nature of the record on the factual basis for the Forest Service's analysis . . . ." *See Native Ecosystems Council*, 418 F.3d at 964.

## II. CONCLUSION

There is a glaring omission in the Access Amendment ESA consultation – no analysis of the widespread and recurring problem of road closure breaches and illegal road use in grizzly bear habitat. Roads are the greatest threat to grizzly bears, and this particular grizzly population is the most endangered in Montana.

Under these circumstances, the agencies must act with institutionalized caution and give the benefit of the doubt to the grizzly bear, not simply to their own interest in finality.  The agencies must reinitiate ESA consultation on the Access Amendment to ensure that chronic illegal road use is not undermining the Access Amendment to the extent that it causes jeopardy to this endangered grizzly bear population.

For these reasons, and all of the other reasons stated in briefing, Alliance respectfully requests that the Court order the agencies to reinitiate ESA consultation on the Access Amendment and Pilgrim Project, and prepare a supplemental EIS for the Pilgrim Project.

Respectfully submitted this 11th Day of July, 2019.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
Public Interest Defense Center, P.C.

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiff

CERTIFICATE OF COMPLIANCE

Pursuant to the Case Management Order in this matter, see Doc. 30 adopting Doc.

29, the foregoing brief contains 6,248 words, which is within the 6,250 word limit.

In accordance with Local Rule 7.1, a table of contents, table of authorities, and

index of exhibits are included in this brief.


/s/ Rebecca K. Smith
Rebecca K. Smith
Public Interest Defense Center, P.C.

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiff