

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

ALLIANCE FOR THE WILD
ROCKIES,

Plaintiff,

vs.

CHERYL PROBERT,[1] Kootenai
National Forest Supervisor, *et al.*,

Defendants.

CV 18–67–M–DWM

OPINION
and ORDER

This case concerns previously adjudicated road closures in the Kootenai

National Forest. In October 2013, Plaintiff Alliance for the Wild Rockies

("Alliance") brought an action under the National Environmental Policy Act

("NEPA"), National Forest Management Act ("NFMA"), and Endangered Species

Act ("ESA"), arguing that the Pilgrim Creek Timber Sale Project ("Pilgrim

Project") would create a net increase in linear miles of total roads in violation of

Standard II(B) of the 2011 Access Amendments to the Kootenai National Forest

Plan. Judge Christensen ultimately held that the Project complied with the Access

Amendments, *see All. for the Wild Rockies v. Bradford*, 35 F. Supp. 3d 1246 (D.

Mont. 2014), and the Ninth Circuit affirmed, *All. for the Wild Rockies v. Bradford*,

---

[1] *See* Fed. R. Civ. P. 25(d).

1

856 F.3d 1238 (9th Cir. 2017). The Ninth Circuit deferred to the Forest Service's interpretation of the Access Amendments, concluding it was reasonable for the agency to exclude roads closed to motorized access by berms or barriers from "linear miles of total roads." *Id.* at 1243. The court warned, however, that "any closure that fails to *effectively* prevent motorized access fails to comply with Standard II(B) of the Access Amendments." *Id.* (emphasis added). This case arises out of that cautionary language.

Based on allegations of illegal use precipitated by ineffective closures, Alliance brought claims under NEPA, NFMA, and the ESA. Alliance's NFMA claims and part of its NEPA claim have been dismissed. (*See* Order, Doc. 23.) The remaining issues are: (1) whether the agencies must reinitiate ESA Section 7 consultation regarding the Access Amendments and/or Pilgrim Project; (2) whether there is unpermitted ESA Section 9 take regarding the Access Amendments and/or the Pilgrim Project; and (3) whether the Forest Service must prepare a supplemental environmental impact statement ("EIS") for the Pilgrim Project.

There are three motions before the Court. Alliance first seeks to supplement the administrative record with, or have the Court take judicial notice of, two documents: (1) a 2016 journal article on the population status of the Cabinet-Yaak grizzly bear population (the "Kendall article") and (2) the documents listed in the "Literature Cited" section of the United States Fish and Wildlife Service's 2011

2

Biological Opinion on grizzly bears for the Access Amendments. (Doc. 32.) The parties have also filed cross-motions for summary judgment. (Docs. 36, 40.) Alliance's motion to supplement is denied but its motion for summary judgment is granted.

<h2 style="text-align:center">FACTUAL BACKGROUND</h2>

## I.    Access Amendments

In November 2011, the Forest Service amended the Forest Plans of the Kootenai, Idaho Panhandle, and Lolo National Forests to include wheeled motorized vehicle access and security guidelines. AR283:001790. The "Access Amendments" set standards for open and total roads,[2] and security areas for Bear Management Units ("BMUs") within the Selkirk Recovery Zone on the Idaho Panhandle National Forest and the Cabinet-Yaak Recovery Zone on the Kootenai, Idaho Panhandle, and Lolo National Forests. AR283:001790–91. Individual open and total motorized access density and core area standards were set for each of the thirty BMUs. AR284:001564–66. More specific to the present case, the Access Amendments also set limits on linear miles of open and total roads, known as the "2010 baseline," for each of the seven "Bear Outside Recovery Zone" polygons ("BORZ areas"). AR283:001790. These areas are outside the Recovery Zones but

---

[2] "Open roads are roads that are open for all or part of the active bear year. The measurement of 'total roads' includes roads that do not have restrictions on motorized use and roads that are closed to public motorized use." (Doc. 12-1 at 5.)

experience recurring use by grizzly bears. AR283:001790. The Priest Lake, Pack River, and Mission-Moyie BORZ areas fall within the Idaho Panhandle National Forest, while the Cabinet Face, Clark Fork, West Kootenai, and Tobacco BORZ areas fall within the Kootenai National Forest. *See* AR283:001792–93.

## II.    Pilgrim Project

In 2013, the Forest Service approved the Pilgrim Project, AR14:000969, which authorizes timber harvest on the Kootenai National Forest in order to "maintain[] and increas[e] forest resilience to insects, disease and disturbance . . . and improv[e] big game forage production while providing support to the local economy through commercial timber harvest," AR14:000985. The Project is located entirely within the Clark Fork BORZ area. AR14:001001. The Forest Service's 2013 Record of Decision authorized the construction of approximately 4.7 miles of new permanent roads during Project implementation. AR14:001010. As mentioned above, Alliance previously challenged the Project on the grounds that barriered roads should have counted toward linear miles of total roads. The Ninth Circuit concluded, however, that the mileage was properly omitted, assuming the closures were effective. *All. for the Wild Rockies*, 856 F.3d at 1243.

SUMMARY CONCLUSION

Defendants concede that in developing the Access Amendments and approving the Pilgrim Project, the agencies assumed road closures were effective

and they did not specifically consider the environmental impacts of illegal use caused by ineffective closures. Defendants insist, however, that temporary increases in mileage above baseline levels was explicitly contemplated in and allowed by the Access Amendments. Alliance persuasively shows that while the agencies' assumptions regarding closure effectiveness may have been reasonable in 2011, data over the last eight years demonstrates that ineffective closures have contributed to increases in linear road miles and potentially impacted grizzly bears in ways not previously considered. Accordingly, reinitiation of consultation for both the Access Amendments and the Pilgrim Project is required. It is less clear whether a supplemental EIS for the Pilgrim Project is required. Ultimately though, because the original NEPA documents for the Project incorrectly assumed all closures were effective, a supplemental EIS is necessary.

## LEGAL STANDARD

NEPA and ESA claims are reviewed under the Administrative Procedure Act ("APA"), which authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and to "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). An agency action is unlawfully withheld if the agency

fails to take a "discrete agency action that it is required to take," i.e., an action that is "demanded by law," including "agency regulations that have the force of law." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64–65 (2004) (emphasis omitted). Agency action is arbitrary and capricious if the administrative record demonstrates that the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Where an agency's administrative record is complete and constitutes the whole and undisputed facts underlying agency decisionmaking, summary judgment is the appropriate vehicle to address claims under both § 706(1) and (2). *City & Cty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) ("[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.").

ANALYSIS

**I. Supplementation**

Review under the APA is generally limited to the administrative record that existed at the time the agency made its decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); 5 U.S.C. § 706. Here, Alliance

6

proffers additional documents for consideration: (1) the Kendall article, (Doc. 33-1), and (2) the documents listed in the "Literature Cited" section of the United States Fish and Wildlife Service's 2011 Biological Opinion on grizzly bears for the Access Amendments, (Doc. 33-2). Alliance make three unpersuasive arguments for their consideration: (1) the record for ESA and supplemental EIS claims is not limited by the APA, (2) the proffered documents qualify under certain extra-record exceptions, and (3) the documents can be judicially noticed.

## A.    APA Record Limitations

Alliance first seeks to circumvent the standard extra-records analysis by arguing that both its ESA claim and its claim for a supplemental EIS are not subject to the APA's record limitations. Neither argument is compelling.

### 1.    ESA

ESA claims are analyzed under the APA because the ESA contains no internal standard of review. *Village of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984). However, Alliance insists that because ESA claims are actually brought pursuant to the ESA citizen suit provision, they are not subject to the administrative record limitation of the APA. *See* 5 U.S.C. § 704 (action reviewable under the APA when "there is no other adequate remedy in a court"). In so arguing, Alliance relies on *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011). In *Kraayenbrink*, the court determined that because

7

claims under the ESA citizen suit provision are distinct from claims under the APA, courts "may consider evidence outside the administrative record for the limited purposes of reviewing . . . ESA claim[s]." *Id.* (citing *Wash. Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005)). But it is not that simple.

District courts have interpreted *Kraayenbrink* differently. Many view it as binding precedent that mandates an open record in ESA cases. *See Natural Res. Def. Council v. Zinke*, 347 F. Supp. 3d 465, 500–01 (E.D. Cal. 2018) ("The Court does not make law and cannot ignore an express holding of the Ninth Circuit that is directly on point.") (collecting cases); *see also Indigenous Envtl. Network v. U.S. Dep't of State*, CV 17–29/31–GF–BMM, 2017 WL 9280323, at *1 (D. Mont. Dec. 12, 2017). However, this Court has consistently taken a more restrictive view:

> *Kraayenbrink* leaves us uncertain whether the panel discarded the APA record review rule entirely or simply found that the extra-record documents presented to the district court in that case fit within one of the four standard exceptions outlined above. The better view, in the opinion of this Court, is that the traditional four exceptions still apply to plaintiffs' requests for supplementation of the administrative record for ESA claims, but the narrowness of the construction and application of these exceptions, *see Lands Council v. Powell,* 395 F.3d 1019, 1030 (9th Cir. 2005) ("these exceptions are narrowly construed and applied"), should be relaxed for such claims.

*All. for Wild Rockies v. Kruger*, 950 F. Supp. 2d 1172, 1177 (D. Mont. 2013) (internal quotation marks omitted); *see Native Ecosystems Council v. Marten*, 334 F. Supp. 3d 1124, 1129 (D. Mont. 2018); *Wildwest Inst. v. Ashe*, No. CV

13-6-M-DLC, 2013 WL 12134034, at \*2 (D. Mont. Oct. 18, 2013).

The concern, as stated in *Lands Council*, is that "[w]ere the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the federal courts would be proceeding, in effect, de novo, rather than with the proper deference to agency processes, expertise, and decision-making." 395 F.3d at 1030; *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc) (describing ESA case as "a record review case"). Alliance's argument is therefore rejected, and its ESA claims are subject to the same records limitations as other APA cases.

## 2. NEPA—Supplemental EIS

Alliance similarly argues that the extra-record documents may be considered in conjunction with its supplemental EIS claim because it seeks to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Alliance is correct that "[i]n such cases, review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). However, the record is not boundless. While a challenge under § 706(1) "allow[s] courts to go beyond the point at which the agency considered the record closed," the APA "limits courts to considering the documents the agency considered directly or indirectly that fall under a record review exception."

9

*All. for the Wild Rockies v. Marten*, CV 16–35–M–DWM, 2016 WL 7174671, at

*1 (D. Mont. Oct. 3, 2016). As was the case with Alliance's ESA claims,

supplementation is limited to documents that meet one of the accepted extra-record

exceptions discussed below. *See Lands Council*, 395 F.3d at 1030.

## B.   Extra-Record Exceptions

Alliance argues in the alternative that the proffered documents fit within the

recognized extra-record exceptions:

> In limited circumstances, district courts are permitted to admit extra-
> record evidence: (1) if admission is necessary to determine whether the
> agency has considered all relevant factors and has explained its
> decision, (2) if the agency has relied on documents not in the record,
> (3) when supplementing the record is necessary to explain technical
> terms or complex subject matter, or (4) when plaintiffs make a showing
> of agency bad faith.

*Id.* (internal quotation marks omitted). Alliance relies on (1) and (3).

Despite Alliance's characterization, the third exception is not at issue

because Alliance has not shown the proffered documents are required to "explain

technical terms or complex subject matter." *Id.* Rather, Alliance emphasizes that

consideration of the information is necessary "to determine whether the agency has

considered all relevant factors," *id.*, and provide necessary background

information, *see Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir. 1988).

The merits question is whether ineffective road closures were accounted for

in the agencies' consideration of the Access Amendments and Pilgrim Project.

10

Neither the Kendall article nor the general list of "Literature Cited" speaks to this narrow issue. This case is not an opportunity to relitigate the Access Amendments' approach to grizzly bear recovery. Because Alliance has not shown that the documents are necessary to determine whether the agencies considered all relevant factors related to the limited closures issue, supplementation is not appropriate.

## C. Judicial Notice

Alternatively, Alliance asks the Court to take judicial notice of the proffered documents on the grounds that the documents are "the agency's own records." *Dent v. Holder*, 627 F.3d 365, 371 (9th Cir. 2010). Courts may take judicial notice of a fact if it "is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). While published government documents are generally subject to notice, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010), the contents of those documents cannot be used to second guess an agency decision, *see All. for the Wild Rockies v. Zinke*, 265 F. Supp. 3d 1161, 1175 (D. Mont. 2017). Fundamentally, "a party cannot circumvent the rules governing record supplementation by asking for judicial notice rather than supplementation." *All. for the Wild Rockies*, CV 16–35–DWM, 2016 WL 7174671 at *3 (internal quotation marks omitted). Thus, judicial notice is not

11

appropriate.

Based on the foregoing, Alliance's motion to supplement is denied.

## II.    Summary Judgment

As mentioned above, the crux of this dispute is whether the agencies adequately considered the impact of ineffective road closures on grizzly bears when they adopted the Access Amendments and approved the Pilgrim Project. While Defendants concede that the decision documents do not explicitly address ineffective road closures or illegal road use, they maintain that the agencies' consideration of "temporary" road impacts was, and continues to be, sufficient. Alliance, on the other hand, insists that the omission has resulted in unpermitted take in violation of Section 9 and requires reinitiation of consultation under Section 7 of the ESA. Alliance also argues a supplemental EIS is required under NEPA. While its NEPA claims presents a closer question, Alliance prevails on both its ESA and NEPA claims.

### A.    ESA[3]

"The ESA obligates federal agencies 'to afford first priority to the declared national policy of saving endangered species.'" *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1084–85 (9th Cir. 2005)

---

[3] Certain sections with Title 50 of the Code of Federal Regulations were updated as of September 26, 2019. This order uses the regulatory citations in place at the time of the agency action and referred to by the parties in their briefing.

(quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)). Section 7 of the ESA directs each action agency to ensure, in consultation with the Fish and Wildlife Service, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" or cause the "destruction or adverse modification" of habitat designated as "critical" for such species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b). If, as is the case here, either the action agency or the consulting agency determines that the action "may affect" listed species or designated critical habitat, the agencies engage in formal consultation. 50 C.F.R. § 402.14(a). As a result of that consultation, the Fish and Wildlife Service issues a biological opinion, which assesses whether an action is likely to jeopardize a listed species or its critical habitat. 50 C.F.R. § 402.14(g)–(h). Where an action does not jeopardize a species but may result in incidental take, the Fish and Wildlife Service issues an "incidental take statement." Any taking in compliance with the statement's terms and conditions is then exempt from the general take prohibition of ESA Section 9. 16 U.S.C. § 1536(b)(4)(iv), (o)(2).

Here, the Forest Service formally consulted with the Fish and Wildlife Service in developing the Access Amendments, and the Fish and Wildlife Service issued a Biological Opinion. *See* AR284:001553–1779. The ESA analysis for the Pilgrim Project was then tiered to that biological opinion, AR12:000930, which

13

also contains an incidental take statement for grizzly bears, providing that:

> permanent increases in linear miles of open road and/or permanent increases in linear miles of total road beyond the standards in Table 4 of this biological opinion will result in levels of take that exceed the amount of incidental take we anticipate here.

AR284:001662. Table 4 provides the following baselines for each BORZ area:

| BORZ Name | Grizzly Bear Ecosystem | Total Size (Acres) | NFS Lands (Acres) | Total Linear Miles of Roads on NFS Lands | Total Linear Miles of Open Roads on NFS Lands |
|---|---|---|---|---|---|
| Priest Lake | Selkirk | 80,733 | 75,793 | 316.4 | 314.4 |
| Pack River | Selkirk | 33,869 | 28,097 | 41.9 | 37.9 |
| Mission-Moyie | Cabinet-Yaak | 71,545 | 58,472 | 200.3 | 167.3 |
| Clark Fork | Cabinet-Yaak | 101,701 | 100,223 | 256.1 | 176.9 |
| Cabinet Face | Cabinet-Yaak | 27,140 | 26,177 | 164.1 | 128.0 |
| West Kootenai | Cabinet-Yaak | 173,122 | 169,705 | 615.3 | 315.9 |
| Tobacco | Cabinet-Yaak | 287,240 | 266,947 | 1,123.9 | 867.0 |

AR284:001571. The take statement requires that the Forest Service submit annual

monitoring summary reports to the Fish and Wildlife Service, which detail the

Forest Service's progress toward achieving the Recovery Zone standards.

AR284:001664. While not required, included in these reports is information about

open and total road mileage for each BORZ area. *See, e.g.*, AR43:000081 (2017

Annual Monitoring Summary Report).

Alliance argues that because the Forest Service and Fish and Wildlife

Service failed to take into account ineffective road closures in their ESA analysis

for both the Access Amendments and the Pilgrim Project, reinitiation of

consultation is necessary. Under the ESA implementing regulations, an agency

must reinitiate consultation on an action:

> (a) If the amount or extent of taking specified in the incidental take
> statement is exceeded;
> (b) If new information reveals effects of the action that may affect listed
> species or critical habitat in a manner or to an extent not previously
> considered;
> (c) If the identified action is subsequently modified in a manner that
> causes an effect to the listed species or critical habitat that was not
> considered in the biological opinion; or
> (d) If a new species is listed or critical habitat designated that may be
> affected by the identified action.

50 C.F.R. § 402.16. Alliance persuasively argues that reinitiation is required under

subsections (a), (b), and (c).

## 1. Preliminary Matters

### a. Scope of Challenge

Defendants first argue that Alliance has improperly expanded the scope of

its ESA challenge on summary judgment to include BORZ areas and a Recovery

Zone not mentioned in its Notice of Intent to Sue or Amended Complaint.

Defendants insist that the current case should be limited to the closures identified

in the Clark Fork and Tobacco BORZ areas. Alliance, on the other hand, argues

that the Forest Service was on notice that its reinitiation challenge requires

consideration of all of the BORZ areas and Recovery Zones. Neither side is

entirely correct.

15

In its December 20, 2018 Order, the Court focused on the specific closures Alliance identified in the Tobacco and Clark Fork BORZ areas. (*See* Doc. 23 at 19 ("Here, Alliance provided the Forest Service with sufficient notice of the issue of concern (road closures) within a discrete area (the Tobacco and Clark Fork BORZs.").) However, Alliance's Notice of Intent to Sue includes language more broadly applicable to Alliance's reinitiation challenge: "[T]he agencies must reinitiate ESA consultation on the Access Amendments and Pilgrim Project because the original analyses presumed no motorized access would occur behind berms and that assumption has proven false." (Doc. 12-1 at 4.) Similarly, Alliance's Amended Complaint specifically alleges:

> Because (1) numerous earthen berms fail to effectively prevent motorized access, (2) numerous roads are open for motorized use although they are designated as closed, and (3) there are a number of illegal user-created open roads on the landscape, [the Forest Service] has allowed an increase in open and/or total roads above the Access Amendments baseline, which exceeds the amount of take authorized by the incidental take statement, thereby triggering the need for reinitiation of consultation.

(Doc. 4 at ¶ 113.) The Forest Service was therefore on notice of Alliance's broader reinitiation challenge, which is based on the same underlying facts as its allegations regarding the Clark Fork and Tobacco BORZ areas: illegal road use based on ineffective closures that were not considered during the original ESA process. On the other hand, insufficient notice was provided regarding Alliance's present allegations of increased mileage and illegal road use within Recovery

16

Zones, which are subject to different mileage standards. The present case is thus limited to the BORZ areas.

### b.    Relative Importance of BORZ Areas

The parties also dispute the relative importance BORZ areas play in grizzly bear recovery. Fundamentally, Alliance argues that BORZ areas are important to grizzly bear habitat and recovery and the Access Amendments do not provide enough protection. But Alliance cannot use this case to relitigate the Access Amendments' approach to grizzly bear recovery. Any argument that the Access Amendment standards for BORZ areas provide inadequate protection to grizzly bears is beyond the scope of this case. *See All. for the Wild Rockies*, 856 F.3d at 1240 ("The Recovery Plan prescribes less protective management measures in BORZ polygons than in recovery zones."); *see also* AR284:001649 (noting that many current forest plans "do not specifically require management for grizzly bears or their habitat outside of the recovery zones").

### c.    Reinitiation by the Fish and Wildlife Service

Finally, Defendants argue that Alliance cannot maintain a reinitiation claim against the Fish and Wildlife Service because the Fish and Wildlife Service lacks the authority to require an action agency to reinitiate consultation. (Doc. 41 at 41–42.) This argument is inconsistent with the Ninth Circuit's view of consultation duties. *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d

17

1220, 1229 (9th Cir. 2008) ("The duty to reinitiate consultation lies with both the action agency and the consulting agency."); *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1116 (N.D. Cal. 2017) ("While the federal agencies' arguments might be compelling if this was an issue of first impression, the Ninth Circuit has already addressed this precise issue multiple times and confirmed that both the action agency and the consulting agency have a duty to reinitiate consultation."); *Wild Fish Conserv. v. U.S. Envt'l Prot. Agency*, 331 F. Supp. 3d 1210, 1226–27 (W.D. Wash. 2018) (collecting cases). Moreover, the regulatory language differs between initial consultation, *see* 50 C.F.R. § 402.14(a), and reinitiation of consultation, 50 C.F.R. § 402.16. Section 402.14 merely *allows* the Fish and Wildlife Service to request consultation. Reinitiation under § 402.16, on the other hand, *obligates* either the action agency or the Fish and Wildlife Service to act. Defendants' reliance on *Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1069–70 (9th Cir. 2005), which addresses § 402.14, is therefore misplaced. *See Pacificans for a Scenic Coast v. Cal. Dep't of Trans.*, 204 F. Supp. 3d 1075, 1093 (N.D. Cal. 2016). Alliance's reinitiation claims against the Fish and Wildlife Service stand.

### 2. Access Amendments

Alliance argues that reinitiation is appropriate under 50 C.F.R. § 402.16, as pervasive illegal road use has permitted incidental take to exceed baseline levels

18

under subsection (a); eight years of evidence of such breaches and ineffective closures constitutes new information and reveals new effects on grizzly bears under subsection (b); and, ineffective closures constitute a broken conservation promise amounting to a modification under subsection (c). The record supports all three arguments.

### a.     Reinitiation under subsection (a)

"Reinitiation of formal consultation is required . . . [i]f the amount or extent of taking specified in the incidental take statement is exceeded . . . ." 50 C.F.R. § 402.16(a). Here, the 2010 baseline road conditions for open and total roads serves as a surrogate for incidental take within the BORZ areas: "In the BORZ, permanent increases in linear miles of open road and/or . . . total road beyond the standards in Table 4 of this biological opinion will result in levels of take that exceed the amount of incidental take we anticipate here, and reinitiation of consultation would be required." AR284:AR001662. Alliance argues that these baseline levels have been exceeded. Defendants disagree. The parties' dispute focuses on two aspects of the take statement: (1) what serves as the 2010 baseline and (2) what qualifies as a "permanent increase."

### i.     Applicable Baseline

The parties first dispute the applicable baseline. Alliance insists that the static baseline numbers provided in Table 4 of the Biological Opinion and Table 16

19

of the Record of Decision apply.[4]  Defendants, on the other hand, argue that "the

Access Amendments allow for BORZ area baselines to be updated to reflect on the

ground conditions or corrected in order to provide more accurate information."

(Doc. 47 at 10); *see, e.g.*, AR43:000081 (updating mileage for 2017 bear year).

Defendants insist that such updates can occur in two circumstances: (1) where the

Forest Service lacks discretion to prevent road building and (2) to reflect the

existing linear miles of road in 2010.  Contrary to Defendants' position, the

surrogate take level identified in the Access Amendments is static and pegged to

the specified mileage in Table 4.

As explained by Defendants, the Forest Service has been "updating" the

2010 baseline amounts when it discovers mileage that was inadvertently omitted

from the amounts included in Table 4.  But the Forest Service's repeated

modification of the 2010 baseline mileage is not consistent with the incidental take

statement.  While the take statement provides that the surrogate measure of take for

grizzly bears is "the existing (2010) linear miles of road in each BORZ polygon," it

includes a specific reference to the "standards in Table 4." AR284:001662; *see*

*also* AR284:001571.  The Forest Service may be able to persuasively argue that

there were errors in the 2010 mileages.  *See* AR30:000037 (Table 8 n.1) (annual

monitoring report for bear year 2013 indicating that the baseline condition for open

---

[4]  These tables are the same.  *Compare* AR284:001571 *with* AR283:001848.

roads in the West Kootenai BORZ area was increased from 315.9 to 343.0 "due to the use of two roads to access private lands . . . [that] were not identified as open in the Access Amendments baseline calculations"). But the specific mileages identified in that table were what the agencies considered in concluding that "this level of anticipated take in not likely to result in jeopardy to the grizzly bear." AR284:001663. Naturally then, any mileage not included in Table 4 was not considered in the take analysis. While Defendants are correct that these baselines are "flexible" in that they allow the Forest Service to add and subtract mileages below the baseline mileage amounts, the Forest Service cannot simply "update" that baseline as it goes along. *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1076–77 (9th Cir. 2004) (rejecting the Fish and Wildlife Service's attempt to "update" a biological opinion without reinitiating consultation), *superseded on other grounds by* 81 Fed. Reg. 7214 (Feb. 11, 2016).

Additionally, the record citations the Forest Service relies on in performing its updates is misleading. First, Defendants argue that "geographic information systems data can vary" and that the Forest Service "reserve[d] the . . . right to correct and update systems as needed." (Doc. 47 at 12–13.) The citation for that reservation of rights, however, is to the disclaimer on the cover page of all agency decision documents that merely states data accuracy can vary. *See, e.g.*, AR282:001059. That boilerplate language does not trump the agency's obligations

under the ESA and its implementing regulations. Second, as cited by Defendants, the Final Supplemental EIS for the Access Amendments provides that "[t]he biologists involved in the 2002-2003 BORZ analysis recognized that the mapping may need to be revisited and updated periodically." AR282:001155; (*see* Doc. 41 at 26 n.10). However, there is a difference between altering the BORZ area boundaries (what is contemplated in the Final Supplemental EIS) and adjusting baseline road mileage amounts within those boundaries (what the Forest Service is doing).

The 2010 baseline is static, and the mileage provided in Table 4 of the 2011 Biological Opinion, *see* AR284:001571, sets the threshold for permissible take.

### ii. "Permanent Increases"

While Defendants concede that ineffective closures have caused baseline mileage levels to be exceeded in some instances, they insist those *temporary* increases fall within the existing take statement because it only prohibits *permanent* increases of mileage above baseline conditions. *See* AR284:001662. In response, Alliance argues that "chronically exceeding the baseline" mileage is a permanent increase. (Doc. 44 at 13.) Although Defendants are correct that certain *roads* are temporary, they fail to account for overall *increases* that are permanent.

The two tables below compare the annual mileage for each BORZ area from 2011 to 2018 to the Table 4 baselines:

22

| Total Linear Miles of Roads | | | | | | | |
|---|---|---|---|---|---|---|---|
| **BORZ Area** | **Priest Lake** | **Pack River** | **Mission-Moyie** | **Clark Fork** | **Cabinet Face** | **West Kootenai** | **Tobacco** |
| **Baseline** | **316.4** | **41.9** | **200.3** | **256.1** | **164.1** | **615.3** | **1,123.9** |
| 2011 | 316.4 | 37.7 | 200.3 | 236.3 | 164.1 | 607.9 | 1,109.3 |
| 2012[5] | 319.0 | 37.7 | 200.3 | 238.2 | 164.6 | 654.4 | 1,110.2 |
| 2013 | 319.0 | 37.7 | 200.3 | 238.2 | 164.6 | 641.9 | 1,108.3 |
| 2014 | 319.0 | 37.7 | 200.3 | 236.5 | 164.6 | 641.2 | 1,108.1 |
| 2015 | NA | NA | NA | 256.1 | 165.0 | 654.4 | 1,123.9 |
| 2016 | 325.7 | 37.7 | 272.0 | 240.9 | 165.0 | 638.1 | 1,104.1 |
| 2017 | 325.7 | 37.7 | 268.7 | 250.3 | 166.5 | 671.9 | 1,110.86 |
| 2018 | 319.2 | 37.7 | 271.1 | 250.4 | 169.8 | 639.7 | 1,107.0 |
| **Total Linear Miles of Open Roads** | | | | | | | |
| **BORZ Area** | **Priest Lake** | **Pack River** | **Mission-Moyie** | **Clark Fork** | **Cabinet Face** | **West Kootenai** | **Tobacco** |
| **Baseline** | **314.4** | **37.9** | **167.3** | **176.9** | **128.0** | **315.9** | **867.0** |
| 2011 | 314.4 | 33.7 | 167.3 | 172.4 | 130.0 | 323.7 | 867.0 |
| 2012 | 317.0 | 33.7 | 167.3 | 172.8 | 129.5 | 341.6 | 867.0 |
| 2013 | 317.0 | 33.7 | 167.3 | 172.8 | 129.5 | 342.3 | 864.2 |
| 2014 | 317.0 | 33.7 | 167.3 | 171.2 | 129.5 | 342.3 | 864.1 |
| 2015 | NA | NA | NA | 176.9 | 129.5 | 342.3 | 867.0 |
| 2016 | 317.2 | 33.7 | 240.0 | 183.8 | 130.5 | 340.4 | 860.0 |
| 2017 | 317.2 | 33.7 | 236.7 | 173.3 | 138.0 | 353.53 | 868.0 |
| 2018 | 317.2 | 33.7 | 239.7 | 173.6 | 140.8 | 360.6 | 864.9 |

*See* AR281:000011 (bear year 2011); AR07:000024 (bear year 2012);

AR30:000036–37 (bear year 2013); AR31:000049 (bear year 2014); AR32:000055

(bear year 2015 – limited to Kootenai National Forest); AR42:000068 (bear year

2016); AR43:000081 (bear year 2017); (Ex. 6, Doc. 44-1 at 12) (bear year 2018 –

not in administrative record). These tables reveal that both parties are correct in

---

[5] The baseline and annual values for the Clark Fork and Tobacco BORZ areas appear to have been transposed in the 2012 Report. This chart reflects what is believed to be the actual mileage for 2012.

their assessment of the data. First, as Alliance argues, there was chronic noncompliance with baseline mileages in at least four of the BORZ areas over the last eight years. Second, as Defendants argue, there was variation in the mileage (i.e., temporary roads) in each BORZ area almost every year. *See, e.g.*, AR43:000082 (Table 9 n.6) (annual report noting a temporary increase in linear miles of open roads in the Cabinet Face BORZ "result[ing] from a gate being destroyed and portions of the 808 and 808E receiving use, use on barriered road 5095 and illegal use on two undetermined roads"). Nevertheless, it is the permanency of the overall increase in mileage that matters under the take statement, not the permanency of specific roads. Alliance persuasively argues that mileage increases in at least three of the BORZ areas are permanent in nature.

But even if Defendants could show that mileage from temporary illegal road use will eventually decrease, they cannot make the same "temporary" argument for their annual modifications of the baseline mileages for existing permanent roads. *See, e.g.*, AR43:000082 (Bear Year 2017 Table 9 n.5 (increasing the open road baseline in Cabinet Face BORZ area by 4.1 permanent miles)). As discussed above, "updates" to the 2010 mileage amount are permanent increases that push most of the BORZ areas above baseline levels. *See* AR43:000081 (indicating that baselines have increased in all BORZ areas except for Pack River).

In light of these permanent increases beyond baseline levels, permitted take

24

has been exceeded in violation of Section 9, compelling reinitiation under
§ 402.16(a).

### b.    Reinitiation under subsection (b)

"Reinitiation of formal consultation is required . . . [i]f new information
reveals effects of the action that may affect listed species . . . in a manner or to an
extent not previously considered . . . ." 50 C.F.R. § 402.16(b). However, the mere
existence of new information does not necessarily trigger reinitiation of
consultation. *Conservation Cong. v. Finley*, 774 F.3d 611, 619 (9th Cir. 2014).
The crux of the matter is whether the new information reveals effects that "w[ere]
not previously considered." 50 C.F.R. § 402.16(b).

Defendants concede that the Access Amendments do not directly reference
temporary mileage increases caused by ineffective closures and that they receive
new information every year regarding road closures. *See* AR279:000211.
However, Defendants insist that such effects were considered in the Access
Amendments because the Access Amendments contemplated temporary increases
in road miles for other reasons, such as "temporary roads . . . constructed in order
to access harvest units." *See* AR279:000211–12 (citing the 2013 Biological
Opinion for the 2015 Revised Forest Plan, AR35:001928); AR280:000213;
AR284:001570. According to Defendants, because other temporary road uses
were considered, "there has been no unanticipated event." (Doc. 41 at 36.)

25

Defendants also emphasize the ephemeral nature of ineffective closures, asserting that once discovered, "breaches are typically repaired by the next bear year." AR279:000212.

But Alliance persuasively argues that the nature and impact of the temporary use considered in the Access Amendments is different from illegal use precipitated by ineffective closures. For example, temporary road use associated with timber harvest activities must "be scheduled such that disturbance of grizzly bears resulting from road use is minimized." AR284:001570. Or, certain public motorized use is only allowed "during the bear summer season." AR284:001570. But, as argued by Alliance, illegal use caused by ineffective closures is not subject to any schedule or season. Thus, there is discord between what the Amendments anticipated (regulated temporary use) and what is actually happening (illegal temporary use).[6]

Additionally, while a single breach may itself be temporary, the Forest Service's annual monitoring reports indicate consistent unauthorized use. Thus, at

---

[6] Contrary to the parties' characterization, (*see* Doc. 44 at 22–23; Doc. 47 at 14–16), the above analysis does not implicate agency deference. Defendants can argue that the existing analysis is sufficient to cover illegal use. That proposition is either correct or incorrect based on the factual record. Defendants cannot, on the other hand, simply redefine "temporary" to include illegal road use after the fact and expect the Court to defer to that dubious etymology. *See Motor Vehicles Mfrs. Ass'n of U.S.*, 463 U.S. at 50 (rejecting counsel's "*post hoc* rationalizations for agency action" and reasserting that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself").

a minimum, illegal temporary use appears to impact grizzly bears "in a manner . . . not previously considered . . . ." 50 C.F.R. § 402.16(b); *see Pacificans for a Scenic Coast*, 204 F. Supp. 3d at 1092 ("The loss of this benefit necessarily implies that the project's net effect on listed species and their habitat will be greater than previously thought."). Reinitiation is therefore also required under § 402.16(b).

### c.    Reinitiation under subsection (c)

Finally, "[r]einitiation of formal consultation is required . . . [i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16(c).  Where an action agency does not reinitiate consultation despite the failure of promised conservation measures, the governing biological opinion becomes invalid.  *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012).  However, an action agency is not required to reinitiate consultation due to infrequent, isolated, or insignificant deviations from the biological opinion.  *Forest Guardians v. Johanns*, 450 F.3d 455, 465 (9th Cir. 2006).

Alliance argues that ineffective road closures are a broken conservation promise.  It further argues that the absence of mandatory monitoring will prevent the discovery of failed closures, thus rendering them continually ineffective.  In response, Defendants insist the conservation measures in the biological opinion are

27

being fulfilled. Alliance has the better argument.

As made clear by the Ninth Circuit, "ineffective" closures do not live up to Access Amendments standards, *All. for the Wild Rockies*, 856 F.3d at 1243, which in turn provide the standard for protection under the ESA. And, because monitoring in BORZ areas is not required, it is reasonable to assume ineffective closures have gone undetected. But even to the extent they are documented in the Forest Service's annual monitoring reports, ineffective closures consistently add mileage in the BORZ areas every year. *See* AR11, 24, 37, 49, 55, 68, 81. Contrary to Defendants' position, these breaches are not isolated or "infrequent and insignificant deviations" from the biological opinion. *Forest Guardians*, 450 F.3d at 465. The Forest Service is not required to reinitiate consultation in "each isolated instance in which" there was an ineffective barrier. *Id.* Rather, the record shows chronic deviations from the effective closures envisioned in the Biological Opinion. As a result, reinitiation is also appropriate under § 402.16(c).

### 3. Pilgrim Project

Alliance further argues that reinitiation is required for the Pilgrim Project because infirm closures related to the Project place the Clark Fork BORZ area above the 2010 baselines identified in the Access Amendments. The Pilgrim Project proposed an increase of 4.7 miles in roads. AR12:000900 (Table 3). But, according to the Forest Service, mileage will revert back to below the baseline of

28

256.1 miles after the project because "[u]pon completion of project-related activities all of the previously restricted and new roads used for the project will be closed with permanent closure device (earth berm, rocks, reclamation) and closure order." AR12:000901. Alliance's argument is based on the recent addition of 0.35 miles of permanent road for Road 14622 within the Clark Fork BORZ area. AR4:000209. With this additional mileage, so the argument goes, the pre-Project baseline increases to 256.4. This means that even if the 4.7 miles are effectively closed, the Clark Fork BORZ area will be above the Table 4 baseline of 256.1. *See* AR284:001571.

Alliance's argument regarding the specific 0.35 miles misses the point. Even if the decision documents predicted the Clark Fork BORZ area would be at its baseline capacity at the time the Project began, the annual monitoring reports show that the total linear mileage within the Clark Fork BORZ area has continually remained below the baseline level of 256.1 miles and, most recently, was at 250.4 miles. *See* AR4:000209–10. Thus, even considering the 0.35 additional miles, the Project would not push the Clark Fork BORZ area above baseline. *See id.* The record therefore does not definitively show that take under the Project would exceed permissible levels in the Clark Fork BORZ area as to amount to a Section 9 violation. Nevertheless, Alliance argues that there are additional ineffective closures in the Clark Fork BORZ area, *see* AR232:000767, that are not reflected in

29

the 2018 monitoring report, (Doc. 44-1). Even though the Forest Service insists that ineffective closures have been considered in concluding that baseline levels would not be exceeded, AR232:000768, the continued uncertainty as to the scope of illegal use weighs in favor of Alliance.

Regardless, reinitiation is appropriate because the Pilgrim Project is tiered to the Access Amendments. The program documents for the Pilgrim Project "confirm[] that the baseline access condition and the effects on grizzly bears were considered in the 2011 programmatic biological opinion and the project is in compliance with that biological opinion and incidental take statement." AR12:000930. As a result, "no second-tier biological opinion" was completed for the Project. *Id.* Because reinitiation of consultation is required for the Access Amendments, reinitiation is necessarily required for the Pilgrim Project. *See* 50 C.F.R. § 402.16(b), (c).

### B.    Supplemental EIS for the Pilgrim Project

NEPA is a procedural statute that requires agencies to carefully consider the impacts of, and the alternatives to, federal actions significantly affecting the environment. 42 U.S.C. §§ 4321, 4331. Its purpose is to ensure that agencies take a "hard look" at the environmental consequences of their proposed actions before proceeding. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989). As part of that process, agencies prepare an EIS for any proposed federal

action "significantly affecting the quality of the human environment." 42 U.S.C.
§ 4332(2)(C). Once completed, agencies have "a continuing duty to supplement
existing . . . EISs in response to 'significant new circumstances or information
relevant to environmental concerns and bearing on the proposed action or its
impacts.'" *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 566 n.2 (9th
Cir. 2000) (quoting 40 C.F.R. § 1502.9(c)(1)(ii)). While supplementation is not
required "every time new information comes to light after the EIS is finalized,"
*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989), a supplemental EIS "is
required . . . if changes, new information, or circumstances may result in
significant environmental impacts in a manner not previously evaluated and
considered," *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d
1147, 1157 (9th Cir. 2008) (internal quotation marks omitted). In this context, the
determinative question is whether "the agency has made a reasoned decision based
on its evaluation of the significance—or lack of significance—of the new
information." *Marsh*, 490 U.S. at 378. An impact on a threatened or endangered
species is a factor that indicates potential significance. 40 C.F.R. § 1508.27(b)(9).

Alliance insists that a supplemental EIS is necessary here because
ineffective closures and the attendant illegal road use will have effects on grizzly
bears that may differ from those considered during the original NEPA process.
The Draft EIS for the Pilgrim Project contains seven pages of grizzly bear analysis,

31

*see* AR11:000454–61, and ultimately assumed that all road closures would be effective following the completion of the Project, *see* AR11:000459. Alliance argues that the eight years of monitoring data shows that ineffective closures and illegal road use defy that assumption. The Forest Service, on the other hand, prepared a Supplemental Information Report in February 2019 concluding that additional NEPA review was not necessary. *See* AR232:000765–68. That Report noted temporary increases in total mileage but concluded that there were no permanent increases and, even including temporary roads related to the Project, that mileage remained below Clark Fork BORZ area baseline levels. *Id.* While supplemental information reports are not NEPA documents, courts have upheld their use "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Idaho Sporting Cong.*, 222 F.3d at 566.

As argued by Defendants, the Draft EIS for the Pilgrim Project addressed displacement and disturbance of grizzly bears within the Clark Fork BORZ area: "Human activity within proposed harvest units and along roads has the potential to disturb grizzly bears. These disturbances disrupt a grizzly bear's living patterns, such as the amount of time spent feeding or resting. Ultimately these repeated disruptions may reduce the health and fitness of a bear." AR11:000457. These effects were also discussed in the 2011 Access Amendments EIS:

> In general, these areas have less secure habitat and a higher risk of displacement, disturbance, and mortality to grizzly bears due to the total amount of motorized access and the proportion of open to total roads on the landscape. These conditions are in contrast to areas available to grizzly bears within the respective recovery zones. The observational data indicates that there are very few bears using these areas of higher motorized access outside the recovery zone boundaries. Therefore, it is likely these degraded conditions are affecting very few bears.

AR282:001157. However, the "Direct and Indirect Effects" section of the Project EIS specifically relies on restricted public access to roads. *See* AR11:000459. Thus, while the agency considered bear disturbance and displacement, the actual effects analyzed were limited by its assumption that public use would be effectively restricted. As argued by Alliance, that assumption has shown false, making the ineffectiveness of the road closures a "significant new circumstance[] or information relevant to environmental concerns" that was not previously considered. *See* 40 CFR § 1502.9(c); *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010) (holding that an environmental assessment "predicated on the assumption that no [sage grouse] nesting habitat existed in the project area" did not adequately address impacts of the project).

But Defendants maintain that any such impacts are not "significant" because even if illegal road use was not specifically considered, the impacts of permanent road mileage within the Clark Fork BORZ area, which was considered, remains below baseline levels. The only real argument Alliance provides in response is that a lack of consistent monitoring makes the extent of ineffective road closures

unclear. But such uncertainty does not necessarily translate into "significant new circumstances." Nor does the requirement for reinitiation under the ESA necessarily mandate supplemental NEPA analysis. *See W. Watersheds Project v. Salazar*, 993 F. Supp. 2d 1126, 1142 (C.D. Cal. 2012). This therefore leads to the close question of whether the incorrect assumptions of the NEPA documents coupled with the uncertainty of the extent of ineffective closures is sufficient to trigger supplemental analysis. It is. *C.f. All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1036 n.18 (9th Cir. 2018) (highlighting uncertainty of whether roads labeled "undetermined" were included in Access Amendments baseline). A supplemental EIS is therefore necessary.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Alliance's motion to supplement (Doc. 32) is DENIED. Alliance's motion for summary judgment (Doc. 36) is GRANTED. Defendants' cross-motion for summary judgment (Doc. 40) is DENIED. This matter is remanded to the agencies to reinitiate consultation for both the Access Amendments and the Pilgrim Project and prepare a supplemental EIS for the Pilgrim Project. The Clerk is directed to enter judgment and close the case.

Dated this 3rd day of October, 2019.

08:55 A.M.

Donald W. Molloy, District Judge
United States District Court

34